Larry **EWERS** and Larry Ewers Ford, Inc., Plaintiffs–Appellants,

v.

**FORD MOTOR COMPANY, Ford Leasing Development Co. and Ford Motor Credit Co., Defendants–Appellees.**

No. 87–8029.

United States Court of Appeals, Eleventh Circuit.

May 2, 1988.

Nickolas P. Chilivis, Chilivis & Grinder, Atlanta, Ga., for plaintiffs-appellants.

Ben L. Weinberg, Jr., Long, Weinberg, Ansley & Wheeler, Kathryn S. Whitlock, M. Diane Owens, Thomas M. Byrne, Sutherland, Asbill & Brennan, John H. Fleming, Atlanta, Ga., for defendants-appellees.

Before RONEY, Chief Judge, JOHNSON, Circuit Judge, and PECK *, Senior Circuit Judge.

JOHN W. PECK, Senior Circuit Judge:

In October of 1982 Larry Ewers received a call from Ford Motor Company's District Sales Manager in Atlanta, Don Laye, who asked him if he would be interested in a dealership in the Atlanta area. Ewers had previously explored the possibility of purchasing a Ford dealership in Memphis but the deal was not consummated due to legal complications which are not clear from the record. Because of his experience in Memphis, Ewers asked Laye if there were any legal problems with the Atlanta dealership. According to Ewers, Laye responded that there had been some lawsuits filed, but that they were now "cleared up." Laye also said that Ford Credit had obtained the dealership property by foreclosure on September 7, 1982 with permission from the bankruptcy court.

Ewers flew to Atlanta on October 14, 1982 to tour the dealership site. Steve Schneider, whom Ewers intended to be his general manager, inspected the dealership facility with Ewers. Ewers contends that he again expressed his concern about legal problems with the dealership. Laye and another Ford representative who joined the discussion both responded that no problem existed. While discussing needed improvements to the facility, Ewers alleged that Laye brought up the subject of the need for certain signs. Ewers claims they also discussed the paging system. At no time did Laye relay any misgivings that these changes could not be accomplished.

The property on which the facility was located was to be conveyed from Ford Credit, which had obtained it through the foreclosure, to Ford Leasing. Ford Leasing then would lease the dealership site to Ewers Ford. Laye told Ewers that if Ewers were to acquire the franchise he could purchase the property at a favorable price from Ford Leasing under Ford's Dealership Facilities Purchase Plan within three years. Laye indicated to Ewers that, in his opinion, the property was worth a million dollars more than Ford Credit bid for it at the foreclosure. It is not disputed that Ewers was very interested in eventually buying the property from Ford and that this, for him, was an important part of the deal.

On October 18, 1982 Ewers completed an application for Ewers Ford to enter into a Ford Sales and Service Agreement. The transaction could not be finalized until after a rezoning hearing which was to occur in February, 1983. Ewers made several more trips to Atlanta during the fall of 1982, all of which included visits to the dealership site.

In late February, 1983 Laye obtained the keys to the property and gave them to Ewers so that he could begin preparing the

---

* Honorable John W. Peck, Senior U.S. Circuit Judge for the Sixth Circuit, sitting by designation.

dealership for an opening. While on the site on March 2, 1983 an appraiser arrived on the property and told Ewers that he was there to make an appraisal of the property for use in a court proceeding. A representative of Ford, Mr. Ward, then arrived on the scene. When Ewers asked Ward if he could explain what was going on, Ward suggested Ewers call Ford's lawyer. Ewers telephoned the lawyer and was told that there was going to be a court proceeding the next day but that Ewers was not to worry because it did not concern him in any way.

On March 3, 1983 Ewers was again on the dealership site when Ford Credit's Atlanta branch manager, Paul Sanders, arrived and asked Ewers to leave. Sanders told Ewers that his presence on the property might be detrimental to Ford Credit's case. Ewers became upset and went to the airport, intending to return to Texas. Laye contacted Ewers at the airport and convinced him to stay and attempt to work things out. The next day Ewers met with Mike Shanks, who was Laye's superior. According to Ewers, Shanks also assured him that the litigation would not be a problem for him.

Ewers executed his agreement with Ford on March 9, 1983 and opened for business in early April of that year. Soon after that time Ewers began to hear rumors that there were problems with the title to the dealership property. At approximately this same time, Ewers also learned that a *lis pendens* had been filed against the dealership property by James Allen, the previous dealer. Ewers contacted Laye by phone and Laye agreed to meet him for lunch to talk about the situation. At their meeting Laye offered Ewers a proposed addendum to the lease providing that Ewers would be paid $100,000 in liquidated damages in the event of dispossession. Ewers alleges that at this point Laye told him there was considerable litigation in process concerning the property on which the facility was located. It was at this point that Ewers hired an attorney.

In late April, 1983, Ewers learned that the reason the previous dealer, Allen–Rus-

sell, did not have an outdoor paging system and had only one large sign was because of certain restrictive covenants that Allen–Russell had entered with neighboring homeowners in 1980. The restrictive covenants prohibited outdoor paging and imposed certain limitations on landscaping, the extent of lighting, and the number of signs that could be used on the dealership property.

■ Ewers became increasingly unhappy with his association with Ford and finally on July 15, 1983 Ewers delivered a notice of termination to Ford pursuant to the Sales and Service Agreement. As a result of the termination, Ewers claimed to have lost $70,903 of the amount he invested in the dealership. Ewers filed a complaint against Ford Motor Company, Ford Leasing Development Company and Ford Motor Credit Company on August 17, 1983. By the time of trial on September 17, 1985, Ewers had withdrawn several counts from his complaint. The following two remained: a claim for rescission due to fraud and a claim of damages from a violation of the Georgia Motor Vehicle Dealer's Day in Court Act, O.C.G.A. §§ 10–1–630, *et seq.* After a week of trial and at the close of plaintiffs' case, Ford moved for a directed verdict. The court granted the motion from the bench. In summary, the district court found that Ewers had not presented a viable fraud claim because as a matter of law he had not exercised due diligence to protect himself in the business venture. The court also held that the Dealer's Day in Court Act in Georgia applies only to acts after July 1, 1983 and accordingly there was not enough evidence to submit this question to the jury. We affirm the district court's decision concerning the Dealer's Day in Court Act claim but, for the reasons stated below, reverse the court's granting of Ford's motion for a directed verdict concerning the issue of fraud.

In an action for fraud the plaintiff must show that

the defendant made a false, material representation of an existing fact with knowledge that it was false or with reckless disregard as to whether it was true

and that it was with the intent that it be acted upon by the plaintiff; and, further, that the plaintiff acted upon the misrepresentation in reasonable reliance of its truth in a manner reasonably foreseeable by the defendant and to the plaintiff's proximate injury.

*Brown v. Techdata Corp.,* 238 Ga. 622, 625, 234 S.E.2d 787, 790 (1977). Central to this case is the applicability to the facts of the "reasonable reliance" element of the fraud claim. One cannot claim "reasonable reliance" on the false representations of another when, in the exercise of ordinary or due diligence, the plaintiff could have discovered the falsity of the representations before acting in reliance on those representations. *Barrett v. Independent Order of Foresters,* 625 F.2d 73, 74 (5th Cir.1980) (citing *Cole v. Cates,* 113 Ga.App. 540, 149 S.E.2d 165 (1966)). This element has also been characterized in terms of whether the plaintiff "justifiably relied" upon the defendant's false representations. *See Gibson v. Home Folks Mobile Home Plaza, Inc.,* 533 F.Supp. 1211, 1217 (S.D. Ga.1982).

Generally Georgia courts have found that the issue of ordinary or due diligence is a matter for the jury to decide "except in plain and indisputable cases." *Id.* at 1216 (quoting *Brown,* 238 Ga. at 625, 234 S.E.2d at 790–91); *Gaines v. Watts,* 224 Ga. 321, 323, 161 S.E.2d 830, 832 (1968); *Hannah v. Belger,* 436 F.2d 96, 99 (5th Cir.1971). A lack of diligence has been found as a matter of law when the plaintiff "blindly relies" upon the representations of another "without rhyme or reason." *King v. Towns,* 102 Ga.App. 895, 901, 118 S.E.2d 121, 126 (1960); *see Adkins v. Lee,* 127 Ga.App. 261, 264, 193 S.E.2d 252, 254 (1972) (quoting *Feingold v. McDonald Mortgage Co.,* 166 Ga. 838, 840, 145 S.E. 90, 91 (1928)) ("Blind reliance exists where 'it cannot be said that the purchase originated in fraud so much as in the carelessness of the purchaser to exercise ordinary care for his own interests.'"). As a matter of law the failure of due diligence may be found when the alleged fraud consisted of defendant's silence and plaintiff could have discovered the truth by simple inspection. *See West-*

*brook v. Beusse,* 79 Ga.App. 654, 54 S.E.2d 693 (1949) (representation that timber on land had not been cut was not fraud as a matter of law when simple inspection could have disclosed truth). A lack of due diligence has been found as a matter of law when the plaintiff clearly had notice that the fact was misrepresented but nevertheless acted upon the representation. *See Grant v. Aulicky,* 161 Ga.App. 817, 290 S.E.2d 107 (1982) (holding summary judgment in favor of vendor proper where water spots were notice to home purchaser of leaky roof even though vendor represented that roof was in good condition).

■ In applying the facts of the instant case, it cannot be said that Ewers unreasonably acted in "blind reliance" on the representations of Ford. Ewers questioned Don Laye several times about whether there were any legal problems with the Atlanta dealership, and indeed called the lawyers at Ford with the same question. Ewers questioned representatives at Ford concerning matters about which they were in a position to know and concerning which they had superior knowledge. *See Gibson, supra,* 533 F.Supp. at 1219 (holding that plaintiff who visited the property in question and questioned the representative extensively could not be found to have failed to exercise due diligence for purposes of summary judgment). The respective knowledge and the means of knowledge of the two parties in this case are dispositive of the fact that Ewers lacked equal facility for ascertaining the truth.

Ewers' concerns could not have been satisfied by "simple inspection" as is the case in many contested real estate transactions. Ewers also was not put on notice that the dealership had legal problems. In fact, Ford's representatives assured him repeatedly that he needn't worry, assuring Ewers that the legal proceedings did not concern him. Certainly Ewers could have gone further in his investigation concerning any legal problems with the dealership property, but exhaustion is not required under the diligence standard. *Gibson, supra,* 533 F.Supp. at 1216; *see also Ro-*

*drigue v. Mendenhall,* 145 Ga.App. 666, 244 S.E.2d 598 (1978) (holding that it was not necessary that buyer of printing equipment, which was fraudulently represented not to be encumbered, exhaust all means at his command to ascertain the truth of the representations).

■ Appellee makes much of the fact that the *lis pendens* filed against Ford was notice to the world that there was pending legal action concerning the property on which the dealership facility was located. Appellee argues that Ewers was required to search the *lis pendens* docket and the deed records to search for restrictions burdening the property on which Ewers proposed to operate his business. We find that the district court erred in ruling that as a matter of law Ewers had the duty to investigate the records in question and was not entitled to rely upon Ford's representations made in response to direct inquiries. We find no authority in Georgia case law to support the notion that as a matter of law one has the duty to investigate or search a title before signing a contract to rent property.

This was also not a transaction in which a "sale" was made and the parties would not anticipate having a relationship following the closing of the deal. On the contrary, after securing the franchise, Ewers was to have an ongoing relationship with Ford, one in which, according to the Ford Sales & Service Agreement, Ewers was to have "confidence in [Ford's] integrity and ability, its intention to provide competitive products and assist the Dealer to market them successfully, and its desire to maintain high quality dealers." In turn, Ford was to rely on Ewers' "integrity and ability" to carry out his responsibilities as a Dealer. The Agreement further states: "It is the expectation of each of the parties that by entering into this agreement, and by the full and faithful observance and performance of its duties, a mutually satisfactory relationship will be established and maintained."

Appellant asks this court to find that Ewers enjoyed a confidential relationship with Ford, therefore eliminating the need to show reasonable diligence before stating a claim of fraud. We find it unnecessary under these facts to make that determination, and find rather that the continuing relationship that Ewers was to have with Ford, which was based on the "integrity of the parties," is an important factor to be weighed in determining "justifiable reliance."

We find that a genuine issue of material fact exists as to whether Ewers justifiably relied on Ford's misrepresentations in entering into the contract, which is at the heart of the present action. Accordingly, the district court's order granting Ford's motion for a directed verdict is REVERSED and we REMAND for further proceedings consistent with this opinion.