CAPITAL FORD TRUCK SALES, INC.
and William M. Anderson

v.

FORD MOTOR COMPANY.

Civ. No. 1:90–cv–507–ODE.

United States District Court,
N.D. Georgia,
Atlanta Division.

March 31, 1992.

Dirk Glen Christensen, Homer Lamar Mixson, Suzanne Forbis Herron, Bondurant Mixson & Elmore, Atlanta, GA, for plaintiffs.

Carey P. DeDeyn, Laura Malynn Shamp, Sutherland, Asbill & Brennan, Atlanta, GA, Jill Nickerson MacDonald, Ford Motor Co., Dearborn, MI, pro hac vice, for defendant.

## ORDER

ORINDA D. EVANS, District Judge.

This case, alleging price discrimination and other federal and state law claims, is before the court on the following motions: (1) Defendant's motion for summary judgment on the constitutionality of the Georgia Motor

Vehicle Franchise Practices Act; (2) Defendant's motion for summary judgment on the merits of Plaintiffs' claims; (3) Defendant's motion to file an out of time motion to compel; (4) Plaintiffs' motion to notify the Attorney General of the State of Georgia of an attack on the constitutionality of the Georgia Motor Vehicle Franchise Practices Act; (5) Defendant's motion to exclude affidavits filed in opposition to Defendant's motion for summary judgment; (6) Plaintiffs' motion to abstain; (7) Plaintiffs' motion for a continuance; and (8) Plaintiffs' motion for leave to file a supplemental brief in opposition to Defendant's motions for summary judgment.

## I. *Factual Overview.*

This action, brought by Plaintiffs Capital Ford Truck Sales, Inc. ("Capital Ford") and its principal shareholder, William M. Anderson ("Anderson"), involves a challenge to the wholesale pricing mechanism used by Defendant Ford Motor Company ("Ford Motor") in selling medium and heavy trucks to Ford Motor's truck dealers, including Capital Ford. The complaint alleges numerous federal and state law claims arising out of the pricing mechanism, including violations of the Federal Dealer's Day in Court Act, 15 U.S.C. § 1221, *et seq.*; the Georgia Motor Vehicle Franchise Practices Act, O.C.G.A. § 10–1–620, *et seq.*; Section 1 of the Sherman Anti–Trust Act, 15 U.S.C. § 1;[1] and the Robinson–Patman Act, 15 U.S.C. § 13(a). The complaint also alleges breach of fiduciary duty under common law. Plaintiffs also assert a claim for "increased interest costs" in connection with the floor planning of Plaintiffs' truck inventory by Ford Motor Credit

Company ("FMCC"), a wholly owned subsidiary of Defendant Ford Motor.

Defendant Ford Motor is engaged in the manufacture of various types of vehicles, including heavy, medium and light duty trucks. At the time the complaint in this action was filed, Plaintiff Capital Ford was in the business of selling and servicing trucks manufactured by Ford Motor. Capital Ford purchased vehicles and operated in the Atlanta, Georgia area pursuant to several written agreements executed by Capital Ford and Ford Motor.[2]

The principal agreement was a document dated September 1, 1973 entitled "Ford Heavy Duty Truck Sales and Service Agreement" (the "Sales and Service Agreement").[3] The Sales and Service Agreement incorporated, as part of its terms and conditions, periodic notices issued by Ford Motor known as "Heavy Duty Truck Terms of Sale Bulletins" ("Bulletins"). At all times relevant to this litigation, the Bulletin applicable to the Sales and Service Agreement between Capital Ford and Ford Motor was the "Heavy Duty Truck Terms of Sale Bulletin No. HT–4," effective April 1, 1981.[4]

The principal focus of Plaintiffs' complaint is two pricing programs, implemented by Ford Motor under the Sales and Service Agreement in 1980,[5] and expanded in the following years. Those programs were known as the competitive price assistance ("CPA") program and the government price concession ("GPC") program. As the programs initially operated, Ford Motor would lower its wholesale heavy truck prices (*i.e.*,

---

1. By order dated September 12, 1990, 779 F.Supp. 1345, this court granted in part and denied in part Ford Motor's motion to dismiss. The court specifically found that the two pricing programs at issue in this suit (the CPA and GPC programs discussed below) did not constitute vertical price fixing in violation of the Sherman Act. The court dismissed all of Plaintiff's Sherman Act claims with the exception of claims relating to transactions involving Ryder Truck Rental, Inc.

2. In June, 1990, during the pendency of this litigation, Capital Ford ceased operations and has not operated as a Ford Dealership since that time. Capital Ford's agreements with Ford Motor were formally terminated on March 21, 1991.

3. The Sales and Service Agreement superseded a 1969 agreement entered into by the parties.

4. Other agreements between Capital Ford and Ford Motor include a "Ford Truck Sales and Service Agreement," dated September 1, 1973, and a "Foreign Vehicle Sales Agreement," dated April 26, 1976. Capital Ford has also entered into separate agreements with Ford Motor Credit Company relating to floor plan financing for Capital Ford's truck acquisitions.

5. Ford Motor maintains that it has had price assistance programs, in varying forms, for twenty-five years.

the price it charged to dealers) on a case-by-case basis when Ford Motor was notified that its dealer was attempting to sell trucks to certain fleet customers. The lowering of the price was known as competitive price assistance, or CPA, because the dealer received the wholesale price discount only if the dealer could show that competition was underbidding him on the potential sale.[6]

In the years that followed the establishment of CPA/GPC, Ford Motor expanded the program so that CPA/GPC price assistance was applicable to all purchases of heavy trucks. In addition, Ford Motor changed the procedures by which it determined the level of price assistance allowed in each transaction. The program evolved from one in which each request for price assistance was reviewed on a case-by-case basis to one in which published schedules were utilized to set assistance levels. It appears that by the mid–1980s, the program had changed to its current form in which Ford Motor utilized CPA/GPC schedules to set price assistance levels for all sales of medium and heavy trucks to its dealers. These schedules, known as "rainbow schedules" because of their color coded references, set the dollar amount of CPA/GPC available to a dealer in a given transaction based on the model of truck, the option package, and the number of trucks being sold in the transaction.[7]

In cases in which a dealer felt that the initial allowance of CPA/GPC under the rainbow schedule was insufficient, a CPA/GPC appeal procedure was in place in which a dealer could request additional price reductions. Under the appeal process, a dealer provided Ford Motor with data about the "street price" (perceived actual retail value)

of the truck and the amount of anticipated dealer profit on the transaction. Ford Motor then evaluated the appeal, and advised the dealer regarding the amount of additional CPA/GPC, if any, that would be allowed. According to Ford Motor rules, appeals from rainbow schedule allocations were only available if the sale met certain criteria. For a transaction to be eligible for CPA/GPC appeal, it had to involve a sale of ten or more trucks or had to be a sale to one of approximately 2,200 "sales solicitation program" customers ("SSP customers"). Deposition testimony indicates that these appeal criteria were strictly enforced. See Eaton Depo., p. 114; Kahn Depo., p. 187. Capital Ford did not generally sell to SSP customers or to customers who bought more than ten vehicles at one time. Anderson Depo., pp. 369–69, 272–73.

Two final facts bear mention with regard to Ford Motor's CPA/GPC price assistance program. First, evidence in the record supports Plaintiffs' claim that, where a price-assisted sale resulted in a profit to Capital Ford in excess of 4%, Ford Motor would reduce subsequent CPA/GPC awards to "chargeback" that excess profit. Merrifield Depo., p. 109; Bloomquist Depo., pp. 82–83; Anderson Depo., pp. 729, 739, 775–76. Second, there is evidence in the record supporting Plaintiffs' contention that during the mid-to-late 1980s, Ford Motor wholesale truck prices were above actual retail value,[8] thus forcing dealers to request CPA/GPC assistance on 100% of their heavy truck sales.[9] It is these two facts which give rise to a substantial number of Plaintiffs' claims in this action.

---

**6.** When the wholesale price discounts were granted to dealers selling to governmental entities, the program was called government price concession, or GPC. Functionally, the CPA and GPC programs were identical but were handled through different offices until 1990. Litchfield Depo., pp. 81–82.

**7.** The rainbow schedules set different levels of CPA/GPC depending on whether the transaction involved 1 truck, 2–4 trucks, or 5 or more trucks.

**8.** Plaintiffs point to evidence that shows increasing differences between wholesale published prices of Ford Motor heavy trucks and the retail market value of those trucks. The evidence

shows that Ford Motor increased wholesale prices of its trucks throughout the mid–1980s so that by 1987, the wholesale prices of Ford Motor's trucks were more than 20% above the Producer Price Index, while the actual retail market value of those vehicles was 3% below the Produce Price Index. See Plaintiff's Depo. Ex. 69, p. 9486.

**9.** The evidence of record shows that by 1988, 100% of all Ford Motor trucks being sold received some level of discount under the CPA or GPC programs. Plaintiffs' Ex. 69, O'Donnell Depo., p. 71.

## II. *Preliminary Motions.*

 Before turning to the substance of Defendant's two motions for summary judgment, the court will address a number of preliminary motions now pending before the court. The first of these is a motion by Plaintiffs Capital Ford and Anderson for a second continuance in responding to Ford Motor's motion for summary judgment on the merits. Plaintiffs seek a continuance to respond to the summary judgment motion until sixty (60) days after McNeilus Truck and Manufacturing, Inc. ("McNeilus"), a non-party to this case, complies with a Minnesota Court order compelling discovery.

Fed.R.Civ.P. 56(f) governs this court in its determination whether to defer ruling on Defendant's motion for summary judgment a second time in order to allow additional discovery. This rule provides, in relevant part:

> [s]hould it appear from the affidavits of a party opposing the motion that the party cannot for reasons stated present by affidavit facts essential to justify the party's opposition, the court may refuse the application for judgment or may order a continuance to permit affidavits to be obtained or depositions to be taken or discovery to be had....

The Fifth Circuit has elaborated on the requirements of Rule 56(f) by explaining:

> [a] party must conclusively justify his entitlement to the shelter of rule 56(f) by presenting specific facts explaining the inability to make a substantive response ... and by specifically demonstrating "how postponement of a ruling on the motion will enable him ... to rebut the movant's showing of the absence of a genuine issue of fact."

*Securities and Exchange Comm. v. Spence & Green Chemical Co.*, 612 F.2d 896, 901 (5th Cir.1980).

A review of Plaintiffs' motion for continuance reveals that they have not met their burden under Rule 56(f). Plaintiffs explain that they have diligently pursued discovery against McNeilus, but fail to present any *specific* facts which demonstrate how postponement of the court's ruling will enable them to rebut Ford Motor's motion for summary judgment on Count III of the complaint.[10] For this reason, Plaintiffs' motion for a continuance is DENIED.

 Also pending before the court is Defendant's motion to exclude 13 affidavits filed by Plaintiffs in opposition to summary judgment. Ford Motor objects to the first ten of these affidavits,[11] collectively known as the Craig Affidavits, on the ground that Plaintiffs failed to produce them in response to a March 29, 1991 request for production served by Defendant.[12] *See* Ford Motor's third request for production of documents, no. 1. As a result, Ford Motor contends that it has been unduly prejudiced because it was denied access to the affidavits in preparing its motion for summary judgment.

Contrary to Defendant's contentions, it appears that any prejudice suffered by Ford Motor was minimal. As of May 3, 1991, Ford Motor was aware that each of the affiants (with the exception of Thomas H. Reeves) was a person having knowledge of the facts alleged in the complaint. *See* Plaintiffs' response to second interrogatories of Ford Motor, no. 1. In fact, in February, 1991, Ford Motor questioned Plaintiff Anderson about each of these individuals, including Mr. Reeves, in deposition. *See* Anderson Depo., pp. 329–47, 392–413. Thus,

---

10. In addition, the court notes that the delay in obtaining the discovery from McNeilus is due, in large part, to the unsuccessful actions of Plaintiffs in attempting to subpoena McNeilus' records in this court rather than in Minnesota. *See* Order of September 19, 1991.

11. The affidavits are submitted by John W. Craig, Hank Harley, Lou Mazure, David Minor, Fred Morton, Ken Nichols, Larry O'Connor, Thomas H. Reeves, Jerry Turnauer, Billy W. Witcher and Fred L. Yates.

12. The request sought production of all written or recorded statements taken from or provided by any person concerning any of the issues or allegations in the litigation. Plaintiffs' initial response on May 5, 1991 indicated that they would produce these affidavits. *See* Plaintiffs' response to Ford Motor's third request for production of documents, No. 1. On June 19, 1991, however, Plaintiffs filed an amended response in which they refused to produce the affidavits on work-product grounds.

Ford Motor had the opportunity to interview or depose these individuals prior to the court imposed discovery deadline of May 30, 1991. In addition, to the extent that the affidavits submitted by Plaintiffs contained information which Ford Motor considered inaccurate, Defendant had the opportunity to respond in one of its two extensive reply briefs in support of summary judgment. Because any prejudice suffered by Defendant was slight, the motion to exclude the Craig affidavits is DENIED.

Ford Motor also seeks to exclude 9 of the 176 paragraphs contained in the affidavit of Plaintiff William M. Anderson, which was submitted by Plaintiffs in connection with their opposition to Ford Motor's summary judgment motions. Ford Motor objects to paragraphs 4, 6 and 7 of the affidavit because the paragraphs contain contentions which conflict with Anderson's deposition testimony. As such, Ford Motor argues that the affidavit contentions do not raise genuine issues of material fact. Plaintiffs concede that the paragraphs appear to be somewhat inconsistent with Anderson's deposition testimony, and they have submitted a supplemental affidavit explaining the differences. In light of this response, the court will not exclude paragraphs 4, 6 and 7 of the Anderson affidavit, but will consider those paragraphs in connection with the Mr. Anderson's supplemental affidavit and deposition testimony. The motion to exclude paragraphs 4, 6 and 7 of the Anderson affidavit is DENIED.

Ford Motor also moves to exclude paragraphs 20 through 25 of the Anderson affidavit on the grounds that the paragraphs contain allegations not made on personal knowledge. The subject paragraphs relate to Plaintiffs' claims of price discrimination in connection with certain transactions involving Ryder Truck Rental, Inc. ("Ryder") and sales to Ryder under "trade packages". In view of the fact that Plaintiffs' claims relating to these transactions are dismissed below, the motion to exclude these paragraphs is unnecessary and is DISMISSED. Similarly, Ford

Motor's motion to exclude the affidavit of Dr. Ferdinand Levy, which was submitted by Plaintiffs in connection with their brief in support of the constitutionality of the Georgia Motor Vehicle Franchise Practices Act, is unnecessary in light of this court's abstention on this issue (see below). That motion is also DISMISSED.

Two other minor motions are also pending before the court. Plaintiffs' motion to file a supplemental brief in opposition to summary judgment is GRANTED. Defendant's motion to file an out of time motion to compel is DISMISSED as moot.

### III. Defendant's Motion For Summary Judgment On The Constitutionality of the Georgia Motor Vehicle Franchise Practices Act and Plaintiffs' Motion To Abstain.

The first substantive motion before the court is Defendant Ford Motor's motion for summary judgment on the constitutionality, under the Constitution of the State of Georgia, of the Georgia Motor Vehicle Franchise Practices Act, O.C.G.A. § 10–1–620, et seq. (the "Franchise Practices Act"). Ford Motor maintains that the Franchise Practices Act is unconstitutional under the "due process" and "impairment of contract" clauses of the state Constitution, as well as under the clause requiring laws to protect people and property "impartially and completely." Capital Ford disputes these claims.

Before considering Defendant's motion for summary judgment, the court must address Plaintiffs' motion to abstain from ruling on the constitutionality of the Franchise Practices Act. In August, 1990, Plaintiffs Capital Ford and Anderson filed an action in the State Court of Fulton County, Georgia against Defendant Ford Motor, seeking to recover for violations of the Franchise Practices Act, breach of fiduciary duty and breach of contract.[13] The parties agree that the operative facts of the state court action, styled *Capital Ford Truck Sales, Inc. and William M. Anderson v. Ford Motor Company,* Civil Action File No. 90–VS–

---

13. Defendant Ford Motor originally removed the state court action to this court. On motion of the Plaintiffs, however, this court remanded the ac-

tion to state court. *Capital Ford Truck Sales, Inc. vs. Ford Motor Co.,* No. 1:90–cv–2062–ODE, slip op. at 4 (N.D.Ga. Jan. 4, 1991).

21786–E, are virtually identical to the facts asserted in the instant case.

The pending motion for summary judgment on the constitutionality of the Franchise Practices Act was filed by Defendant Ford Motor in July, 1991. In their initial response, Plaintiffs argued that the state court was better suited to rule on the constitutionality of the statute under the Georgia Constitution. Defendant Ford Motor has now challenged the constitutionality of the Franchise Practices Act in the state court action by filing a motion for summary judgment. The arguments raised by Ford Motor in the two summary judgment motions are identical, and each of the issues presented to this court regarding the constitutionality of the Franchise Practices Act has been presented to the state court. Under these circumstances, Plaintiffs argue that abstention by this court is warranted.

The Supreme Court has explained:

[A] federal court, adhering to the salutary policy of refraining from the unnecessary decision of constitutional questions, may stay proceedings before it, to enable the parties to litigate first in the state courts questions of state law, decision of which is preliminary to, and may render unnecessary, decision of the constitutional questions presented. *Railroad Commission v. Pullman Co.*, 312 U.S. 496 [, 61 S.Ct. 643, 85 L.Ed. 971].... It is the court's duty to do so when a suit is pending in the state courts, where state questions can be conveniently and authoritatively answered, at least where the parties to the federal court action are not strangers to the state action. *Chicago v. Fieldcrest Dairies*, 316 U.S. 168 [, 62 S.Ct. 986, 86 L.Ed. 1355].

*Meredith v. City of Winter Haven*, 320 U.S. 228, 236, 64 S.Ct. 7, 12, 88 L.Ed. 9 (1943).[14] Other cases have similarly held that when parties to a federal action which raises a difficult state law issue are litigating the identical issue in state court, abstention is warranted. *See Harris County Commissioners Court v. Moore*, 420 U.S. 77, 83, 95 S.Ct. 870, 875, 43 L.Ed.2d 32 (1975) ("[w]here

there is an action pending in state court that will likely resolve the state-law questions underlying the federal claim, we have regularly ordered abstention."); *Albertson v. Millard*, 345 U.S. 242, 244, 73 S.Ct. 600, 601, 97 L.Ed. 983 (1953) (holding that pendency of an identical action in state court involving the construction of a state statute requires the district court to abstain pending the outcome of the state action); *City of Chicago v. Fieldcrest Dairies*, 316 U.S. 168, 62 S.Ct. 986, 86 L.Ed. 1355 (1942) (holding that a federal court action should be stayed where matter of state law is at issue and an identical action is pending in a state court).

As explained by a leading commentator, in discussing abstention in private litigation:

[t]here is no problem if the federal court merely postpones its decision for a time to await an opinion of the state court in an action already pending.... "[t]his course is fairly common, and since it does not require the present parties to institute a second action, it is less burdensome to them than the typical abstention...."

17A Charles A. Wright, Arthur R. Miller & Edward H. Cooper, Federal Practice and Procedure § 4246, at pp. 104–05 (2d ed. 1988) (quoting American Law Institute, Study of the Division of Jurisdiction between State and Federal Courts, p. 297 (1969)). Based on this authority, it appears that abstention is warranted in this case.

Defendant Ford Motor opposes Plaintiffs' motion to abstain on two grounds. First, Ford Motor argues that abstention is unwarranted because the legal issues presented are neither novel nor surrounded by uncertainty. A review of Ford Motor's brief in support of summary judgment, however, belies this claim. The due process challenge, on which Ford Motor principally relies, raises difficult issues regarding whether the "rational relationship" test developed in *Harris v. Duncan*, 208 Ga. 561, 67 S.E.2d 692 (1951) or the "affected with a public interest" test, as explained in *State v. Major*, 243 Ga. 255, 253 S.E.2d 724 (1979), is applicable in determining the constitutionality of the Franchise

**14.** In *Meredith*, the Supreme Court held that the district court below had a duty to exercise its jurisdiction because no case was then pending in state court and no other consideration weighed against the exercise of jurisdiction. 320 U.S. at 228, 64 S.Ct. at 7.

Practices Act.[15] Also at issue is whether the Georgia Supreme Court's invalidation of portions of a prior Georgia statute, the 1976 Motor Vehicle, Farm Machinery and Construction Equipment Franchise Practices Act, as amended, in *Georgia Franchise Practices Commission v. Massey–Ferguson, Inc.,* 244 Ga. 800, 262 S.E.2d 106 (1979), compels this court to invalidate sections of the current Franchise Practices Act which provide a remedy for a manufacturer's failure to act in "good faith". On its face the Georgia Supreme Court's opinion in *Massey–Ferguson* does not provide a clear answer.

Ford Motor's other constitutional challenges to the Franchise Practices Act also raise difficult issues of Georgia constitutional law. Ford Motor's "void for vagueness" argument implicates unresolved issues of Georgia law regarding whether the terms "good faith," "discrimination," "any of its business transaction," "any aspect of dealings," and "any aspect of operating a motor vehicle dealership" are too vague to be enforceable. Similarly, Defendant's claim that the Franchise Practices Act violates the "impairment of contracts" and "impartial and complete" clauses of the Georgia Constitution would require the court to rule on the scope of the Franchise Practices Act and various recent decisions of the Georgia Supreme Court, including *Denton v. Con–Way Southern Express, Inc.,* 261 Ga. 41, 402 S.E.2d 269 (1991). In view of the difficult issues raised, it is clearly the wiser course to allow the state court to authoritatively construe the Franchise Practices Act and to decide on its constitutionality under the Georgia Constitution.

■ Ford Motor makes a second argument in opposition to Plaintiffs' motion to abstain. In light of the fact that Plaintiffs have chosen to institute an action in federal court and to append state law claims, Ford Motor argues that it would be inequitable to now abstain in order to allow a state court to adjudicate on issues of state law. Defendant cites *Fields v. Rockdale County,* 785 F.2d 1558 (11th Cir.), *cert. denied,* 479 U.S. 984, 107 S.Ct. 571, 93 L.Ed.2d 575 (1986) as support for this claim. *Fields,* however, stands only for the proposition that abstention is not proper if the district court finds that the state proceeding is motivated "by a desire to harass or is conducted in bad faith." 785 F.2d at 1562 n. 6 (citing *Huffman v. Pursue, Ltd.,* 420 U.S. 592, 611, 95 S.Ct. 1200, 1212, 43 L.Ed.2d 482 (1975)). As explained in the court's order of January 4, 1991, Plaintiffs are entitled to a state forum to resolve their state law claims. *See Capital Ford Truck Sales, Inc. vs. Ford Motor Co.,* No. 1:90–cv–2062–ODE, slip op. at 4 (N.D.Ga. Jan. 4, 1991). The court cannot say that the state law filing in this case was motivated by bad faith.

■ In view of the fact that difficult issues of Georgia law are raised by Defendant's challenge to the Franchise Practices Act, and in light of the fact that the constitutional validity of the statute is presently being considered in a state court action between these two parties, the court finds that abstention on this issue is warranted. Plaintiffs' motion to abstain is GRANTED. The court will STAY all further proceedings with regard to Counts two, six and seven of Plaintiffs' complaint pending resolution by the State Court of Fulton County, Georgia of the constitutionality of the Franchise Practices Act.[16] In view of this decision, Defendant's motion for summary judgment on the constitutionality of the Georgia Motor Vehicle Franchise

---

**15.** Even if the "affected with a public interest test" were applicable to determine the constitutionality of the statute under the due process clause of the Georgia Constitution, an additional issue would be raised regarding whether the automobile industry affects the public interest.

**16.** Defendant argues that this court should dismiss, rather than stay, Plaintiffs' Franchise Practices Act claims in the event of abstention. Defendant cites *Burford v. Sun Oil Co.,* 319 U.S. 315, 63 S.Ct. 1098, 87 L.Ed. 1424 (1943) as support for this contention. This is not a case of *Burford* abstention in which "federal intervention … would have a disruptive effect on the state's efforts to establish a coherent policy on a matter of substantial public concern." 17A Charles A. Wright, Arthur R. Miller & Edward H. Cooper, Federal Practice and Procedure § 4244 (2d ed. 1988). Under *Meredith v. City of Winter Haven,* 320 U.S. at 236, 64 S.Ct. at 11, the court finds that the proper action in this case is to stay proceedings under counts two, six and seven. *See also Albertson v. Millard,* 345 U.S. at 244, 73 S.Ct. at 1074.

Practices Act is DISMISSED without prejudice to refile. Plaintiffs' motion to notify the Attorney General of the State of Georgia of an attack on the constitutionality of the Georgia Motor Vehicle Franchise Practices Act is DISMISSED as unnecessary.

## IV. *Ford Motor's Motion For Summary Judgment On The Merits.*

With Plaintiffs' claims under the Georgia Motor Vehicle Franchise Practices Act stayed, four claims remain. The court will consider Defendant's motion for summary judgment on Plaintiffs' Sherman Act, Robinson–Patman Act, Federal Dealer's Day In Court Act and common law claims in the order in which the claims appear in Plaintiffs' complaint.

### A. Standard For Summary Judgment.

■ Summary judgment is appropriate only "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the [Defendant] is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). In ruling on Defendant's motion, the court must view the evidence in a light most favorable to Plaintiffs. *Adickes v. Kress & Co.*, 398 U.S. 144, 157, 90 S.Ct. 1598, 1608, 26 L.Ed.2d 142 (1970). To prevail in its motion for summary judgment, Defendant must show that the evidence is insufficient to establish an essential element of Plaintiffs' case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986). If Defendant makes a sufficient showing, then Plaintiffs "must come forward with 'specific facts showing that there is a genuine issue for trial.'" *Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corporation*, 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986) (quoting Fed.R.Civ.P. 56(e)). If the evidence supporting Plaintiffs' claims is insufficient for a jury to return a Plaintiffs' verdict, or is merely colorable or not significantly probative, then Defendant is entitled to summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). If, however, reasonable minds could

differ as to the import of the evidence, and a reasonable interpretation of the evidence could lead to a Plaintiffs' verdict, then summary judgment is inappropriate. *Id.* at 251–52, 106 S.Ct. at 2511–12. With this standard in mind, the court now turns to each of Plaintiffs' claims.

### B. Claims Under The Federal Dealer's Day In Court Act.

In count I of their complaint, Plaintiffs have alleged numerous claims under the Federal Dealer's Day In Court Act (the "Dealer Act"), 15 U.S.C. § 1221 *et seq.* The Dealer Act was enacted "to protect automobile dealers from abusive trade practices employed by manufacturers in an extremely concentrated market." *Stamps v. Ford Motor Co.*, 650 F.Supp. 390, 395 (N.D.Ga.1986) (citing legislative history of the Act). The Dealer Act permits an automobile dealer to bring suit against an automobile manufacturer if the manufacturer fails

> to act in good faith in performing or complying with any of the terms or provisions of the franchise, or in terminating, canceling or not renewing the franchise with said dealer....

15 U.S.C. § 1222. The term "good faith" has a specialized meaning under the Dealer Act. It is defined as the duty of the parties

> to act in a fair and equitable manner toward each other so as to guarantee the one party freedom from coercion, intimidation or threats of coercion or intimidation from the other party: *Provided,* That recommendation, endorsement, exposition, persuasion, urging or argument shall not be deemed to constitute a lack of good faith.

15 U.S.C. § 1221(e). The Eleventh Circuit, in interpreting the Dealer Act, has explained:

> [c]ase law is clear that a manufacturer fails to act in good faith for purpose of recovering under this Act only if its conduct amounts to coercion or intimidation. In absence of coercion, intimidation or threats thereof, there can be no recovery under the Act, even if the manufacturer otherwise acts in "bad faith" as that term is normally used.

**1566**

Cabriolet Porsche Audi, Inc. v. American Honda Motor Co., 773 F.2d 1193, 1210 (11th Cir.1985), cert. denied, 475 U.S. 1122, 106 S.Ct. 1641, 90 L.Ed.2d 186 (1986).

The legislative history of the Dealer Act explains that the "existence of coercion or intimidation depends on the circumstances arising in each particular case and may be inferred from a course of conduct." H.R.Rep. No. 2850, 84th Cong., 2d Sess., reprinted in 1956–3 U.S.Code Cong. & Ad. News 4596, 4603. See also H.C. Blackwell Co. v. Kenworth Truck Co., 620 F.2d 104, 106 (5th Cir.1980). In determining whether a questionable course of conduct amounts to coercion, ascertaining the manufacturer's intent is crucial. See Overseas Motors, Inc. v. Import Motors Limited, Inc., 519 F.2d 119, 123–24 (6th Cir.1975); Stamps, 650 F.Supp. at 397. The Fifth Circuit, in binding authority, has explained:

> [t]he issue of [a Defendant's] bad faith involves its intentions as manifested by its actions. This is a factual determination for the jury. Shor–Line Rambler, Inc. v. American Motors Sales, 543 F.2d 601, 604 (7th Cir.1976). Bad faith may consist of coercive conduct manifested by "a wrongful demand which will result in sanctions if not complied with." Rea v. Ford Motor Company, supra, 497 F.2d [577] at 585 [3rd Cir.1974]. "[W]hether a manufacturer has acted with sufficient justification to constitute good faith in bringing pressure to bear on a dealer is a factual question the determination of which will depend on the circumstances arising in each particular case." Id.

H.C. Blackwell Co., 620 F.2d at 107. See also General Motors Acceptance Corp. v. Marlar, 761 F.2d 1517, 1522 (11th Cir.1985).

■ Plaintiffs set forth three distinct claims under the Dealer Act. They describe their first claim as follows:

Ford Motor engaged in coercive and intimidating behavior by intentionally and with malicious intent inflating the wholesale prices of Ford heavy trucks so that Capital Ford would be coerced into seeking CPA and GPC discounts from Ford Motor. Before giving the needed discount, Ford Motor would coerce Capital Ford into reducing its profit margin to an "approved" level, which level was so small that Capital Ford could not remain in business.

Plaintiffs' Brief Opposing Summary Judgment On The Merits, p. 40. Ford Motor concedes that several of Plaintiffs' factual allegations are correct. It admits that the wholesale prices on its heavy trucks were in excess of the actual retail value and that CPA/GPC assistance was necessary for dealers to make heavy truck sales. It further admits that, in some cases, it made inquiries into the expected dealer profits on individual transactions prior to awarding price assistance.[17] Ford Motor argues, however, that these facts are insufficient to establish a Dealer Act claim. The court agrees.

■ The cornerstone of Plaintiffs' Dealer Act claims is the assertion that Ford Motor structured its pricing system so as to restrict dealer profits to a level insufficient for Capital Ford to remain in business. It is beyond dispute, however, that a manufacturer is free to set prices at any level it chooses.[18] The claim that manufacturer price levels are set too high, or fail to provide a sufficient profit margin for dealers, is insufficient to give rise to a cognizable claim under the Dealer Act. Overseas Motors, Inc. v. Import Motors, Ltd., 519 F.2d 119 (6th Cir.), cert. denied, 423 U.S. 987, 96 S.Ct. 395, 46 L.Ed.2d 304 (1975). Defendant argues that because manufacturer decisions on wholesale price levels are not the proper subject of Dealer Act claims, manufacturer decisions on the level of price

---

**17.** Plaintiffs contend that Ford Motor inquired into dealer profit when awarding price assistance pursuant to the rainbow schedules. The record, however, does not support this contention. Ford Motor points to evidence indicating that no dealer profit inquiry occurred in connection with CPA/GPC requests involving rainbow schedules. O'Donnell Depo., p. 177. In response, Plaintiffs have adduced general evidence showing that dealership profits were restricted through the CPA/GPC program, but no specific evidence showing that Ford Motor inquired into dealer profit in granting rainbow price assistance. It is undisputed that a dealer profit inquiry was made on CPA/GPC appeals.

**18.** Of course, this is subject to certain antitrust requirements which are not applicable in the instant case.

discounts to offer are similarly not the proper subject of claims under the Act. Defendant points out that this is the law under the Sherman Anti–Trust Act, *see e.g., Lehrman v. Gulf Oil Corp.*, 464 F.2d 26 (5th Cir.) (supplier may grant price support to dealer to match competitors' prices, as long as the supplier does not forbid lowering prices below price support level), *cert. denied,* 409 U.S. 1077, 93 S.Ct. 687, 34 L.Ed.2d 665 (1972); *Butera v. Sun Oil Co.*, 496 F.2d 434 (1st Cir.1974),[19] and argues that the same principle should apply in Dealer Act cases.

The court agrees with Defendant's argument. It follows that if manufacturers are free to set wholesale price levels, they are also free to periodically lower those wholesale prices in order to assist their distributors in meeting price competition. Under the rationale of *Overseas Motors,* the discount levels manufacturers choose are not subject to judicial scrutiny, even if insufficient to provide "adequate" profits. The court can conceive of no principled basis by which to distinguish *Overseas Motors* from the instant case. Plaintiff in that case alleged that the price a manufacturer was charging made the cars "commercially noncompetitive." 519 F.2d at 124. In this case, Plaintiffs similarly attack the price level Ford Motor set for its heavy trucks, as ultimately revised by the price assistance program, and contend that the prices were too high. As in *Overseas Motors,* Plaintiffs' claim is, at bottom, simply a challenge to manufacturer wholesale price levels. *Overseas Motors* establishes that regardless of the price a manufacturer chooses, that price is not subject to a challenge as "coercive" or "intimidating" under the Dealer Act. *Id.*

Ford Motor's price assistance program was well within the requirements set by antitrust law. *See* Order of September 12, 1990. Its action in establishing heavy truck wholesale prices at a level which exceeded "street value," and adjusting those prices through the CPA/GPC program, might have been an inefficient or unwise pricing decision.[20] The court, however, has uncovered no case holding that such unwise pricing decisions constitute "bad faith" or "coercion" as those terms are defined in the Dealer Act. *See* H.R.Rep. No. 2850, 84th Cong., 2d Sess. (1956), *reprinted in* 1956 U.S.Code Cong. Admin.News 4596, 4604 (stating that under the Dealer Act, a manufacturer is not required to guarantee profitable operation for a dealer). Under relevant law, Ford Motor was free to set prices at any level, and was free to discount or not discount those prices as it saw fit. In view of this, the court holds that Ford Motor's enforcement of its price assistance program did not amount to "coercion" under the Dealer Act. *See H.C. Blackwell Co.*, 620 F.2d at 107. Defendant is entitled to summary judgment on Plaintiffs' first Dealer Act claim and its motion is GRANTED as to this claim.

Plaintiffs' second Dealer Act Claim relates to the actions of Ford Motor's wholly owned subsidiary, FMCC, the company which financed Capital Ford's floor plan. According to Plaintiffs, FMCC required Capital Ford to pay interest on the inflated wholesale prices of the trucks held in inventory pending the CPA/GPC discount received from Ford Motor. Anderson Depo., pp. 292–96, 683–85. Capital Ford contends that because all profits of FMCC went directly to Ford Motor, this interest charge was another mechanism through which Ford Motor profited from its wholesale price scheme and that

19. In addition, under antitrust law, a manufacturer may condition the lowering of prices on agreements from retailers to pass the lower prices on to consumers. *See AAA Liquors, Inc. v. Joseph E. Seagram & Sons, Inc.*, 705 F.2d 1203 (10th Cir.1982). In *AAA Liquors,* the Tenth Circuit held that such conditional price discounts do not constitute "coercion or pressure to maintain resale prices...." *Id.* at 1206.

20. Actually, Ford Motor argues that one would expect to find published prices in excess of actual selling prices in a highly competitive, capital goods market such as the heavy truck industry. In such an environment, manufacturers and distributors attempt to maintain high published prices to cover rising costs and to provide a high starting point for negotiations. In a market where capacity is in excess of demand, Defendant argues that end-user customers demand and receive deep discounts from published prices. *See Lewis Service Center, Inc. v. Mack Trucks, Inc.*, 714 F.2d 842 (8th Cir.1983), *cert. denied,* 467 U.S. 1226, 104 S.Ct. 2678, 81 L.Ed.2d 873 (1984).

this constitutes a separate Dealer Act violation. This claim is derivative of Plaintiffs' first Dealer Act claim, as it relies on the contention that Ford Motor's setting of wholesale prices on heavy trucks, and subsequent CPA/GPC discounts, violated the Dealer Act. Because Ford Motor's underlying actions do not violate the Dealer Act, *a fortiori*, FMCC's actions are not violative of the Act. For the reasons stated above, Defendant is entitled to summary judgment on this claim.

Plaintiffs' final Dealer Act claim can be disposed of quickly. Plaintiffs assert in their memorandum in opposition to summary judgment that Ford Motor acted in bad faith in terminating the Capital Ford Sales and Service Agreement in March, 1991. A review of the pleadings filed in this case reveals that there is no Dealer Act wrongful termination claim before the court. The claim was not made in the original complaint and Plaintiffs have not amended their complaint to allege that Capital Ford was wrongfully terminated or to allege that Ford Motor failed to perform its obligations under the termination provisions of the Sales and Service Agreement. Accordingly, summary judgment is GRANTED on this claim.

## C. Robinson–Patman Act Claims.

In count III of their complaint, Plaintiffs have asserted several claims under the Robinson–Patman Act, 15 U.S.C. § 13(a). The bulk of these claims relate to alleged unlawful price discrimination in connection with the sale of Ford heavy trucks to: (1) Ryder Truck Rental, Inc.; (2) certain body companies; and (3) other Ford heavy truck dealerships, including Peach State Ford Truck Sales, Inc., the principal competitor of Capital Ford in the Atlanta market. The essence of each of these claims is that the above entities received, either directly or indirectly, greater amounts CPA/GPC than Capital Ford and thus were able to sell to end-user customers at prices significantly below what Capital Ford could offer. Plaintiffs have also asserted price discrimination claims in con-

nection with Ford Motor's handling of its inventory of model CF–8000 trucks. Finally, Plaintiffs contend that the rainbow schedules used by Ford Motor to initially assess CPA/GPC, when considered in conjunction with the limited appeal rules, discriminate in favor of dealers selling to high volume or SSP customers and thus violate the Robinson–Patman Act.

Section 2(a) of the Robinson–Patman Act provides that it is unlawful for a seller "either directly or indirectly, to discriminate in price between different purchasers of commodities of like grade and quality." 15 U.S.C. § 13(a). In order to establish a violation of the Robinson–Patman Act, Plaintiffs must show that Ford Motor discriminated in price between equipment of like grade and quality sold to Capital Ford and to one of Capital Ford's competitors. *Mays v. Massey–Ferguson, Inc.*, 1990–1 Trade Cases (CCH) ¶ 69,028, p. 63,637, 1990 WL 80673 (S.D.Ga.1990). Plaintiffs must also show that the challenged sales were reasonably contemporaneous; that the price discrimination involved a discount that was not "functionally available" to Capital Ford on equal terms; and that there was a reasonable possibility that the discrimination was likely to result in substantial injury to competition. *Id.* Injury to competition may be shown either by "proof of substantial discrimination over time," or "direct evidence of lost sales...." *J.F. Feeser, Inc. v. Serv–A–Portion, Inc.*, 909 F.2d 1524 (3rd Cir.1990). Finally, Plaintiffs must show that the price discrimination caused actual injury to Capital Ford. *Mays,* cited *supra.* Ford Motor contends that each of Plaintiffs' Robinson–Patman claims is insufficient as a matter of law for one or more of the above reason. For ease of analysis, the claims are discussed separately.

### 1. *Sales to body companies.*

Plaintiffs have alleged price discrimination in connection with certain sales of Ford heavy truck chassis to body companies.[21] Capital Ford admits that it did not regularly sell to body companies or compete with other

---

**21.** A body company is a manufacturing concern which adds a special use vehicle body, such as a school bus or cement mixer, to an unimproved

heavy truck chassis and markets the improved product to end-user customers.

Ford dealers for that business. Capital Ford maintains, however, that it competed with body companies for sales of both improved vehicles and bare chassis to certain end-user customers. Anderson Depo., pp. 612–18, 665–67; Litchfield Depo., pp. 126–28. The price discrimination claim rests on the allegation that certain body companies were able to purchase Ford heavy truck chassis from Ford Motor dealers at CPA assisted prices which were less than the prices available to Capital Ford. As a result, Capital Ford maintains that the body companies had a competitive advantage in competing with Capital Ford for end-user customers purchasing improved, specialty vehicles and bare truck chassis. Capital Ford has identified 11 sales or customers which it claims to have lost to body companies during the past four years. See Capital Ford's response to Ford Motor Company's first interrogatories, no. 3; Anderson Depo., p. 577.

■■■ Ford Motor has moved for summary judgment as to this claim on numerous grounds. For the purposes of this motion, it is only necessary to consider Defendant's claim that the evidence of record does not support a finding of actual injury to Capital Ford, and therefore does not establish a *prima facie* case under Section 2(a).

Ford Motor asserts that the product sold by Ford dealers to body companies (heavy truck chassis), and the improved vehicles offered by body companies in competition with Capital Ford (improved specialty vehicles), were substantially different. According to Ford Motor, these differences negate any notion of actual injury because customer preferences and competitive efficiencies enjoyed by the body companies in manufacturing specialty vehicles constitute intervening factors which eliminate the link between Ford Motor's alleged price discrimination and competitive injury suffered by Plaintiffs. See *J. Truett Payne Co. v. Chrysler Motor Corp.*, 451 U.S. 557, 101 S.Ct. 1923, 68 L.Ed.2d 442 (1981); *Perkins v. Standard Oil Co.*, 395 U.S. 642, 648, 89 S.Ct. 1871, 1874, 23 L.Ed.2d 599 (1969). Plaintiffs offer two responses to this contention.

Plaintiffs first argue that the evidence of record shows that body companies who pur-

chased heavy truck chassis at CPA/GPC favored prices often did not improve the vehicles, but instead sold them as bare chassis in competition with Capital Ford. According to Plaintiffs, this fact is sufficient to establish the necessary causal link between Defendant's actions and Plaintiffs' injuries and to negate Ford Motor's claim of competitive efficiency or customer preference. To substantiate this argument, Plaintiffs point to the deposition testimony of their witnesses, primarily Plaintiff Anderson. Plaintiff Anderson, however, testifies only that body companies were selling unimproved truck chassis on the open market. See Anderson Depo., pp. 612–18, 665–67. Plaintiffs point to no evidence showing that Capital Ford was in competition with the body companies for sales of these unimproved chassis, or showing any specific instances in which Capital Ford lost a sale to a body company. Standing alone, Plaintiffs' evidence that body companies sold unimproved chassis in the Atlanta market does not provide direct evidence that Capital Ford lost sales to body companies, and is thus insufficient for a jury to return a Plaintiffs' verdict. See *J.F. Feeser*, cited *supra*. Therefore, the evidence is insufficient to withstand Defendant's motion for summary judgment. *Anderson v. Liberty Lobby*, 477 U.S. at 249, 106 S.Ct. at 2510.

Plaintiffs' second response to Defendant's claim that the evidence of record does not support a finding of actual injury is also unpersuasive. Plaintiffs contend that such evidence is unnecessary in this case. According to Plaintiffs, in cases where a manufacturer engages in price discrimination involving the principal component of a final product, a cognizable Robinson–Patman claim exists without direct evidence of lost sales because an impact on secondary line competition is established. See 5 J. Von Kalinowski, *Antitrust Laws and Trade Regulations*, § 31.01[4][j], at 31–54 (1990). While this may be correct as an abstract proposition, Plaintiffs have failed to adduce sufficient evidence to create a genuine issue of material fact on this claim. Arguably, the evidence of record tends to establish that body companies were able to purchase heavy truck chassis at CPA/GPC favored prices by purchasing

from large volume Ford dealers. As Defendant correctly points out, however, Plaintiffs cite no evidence to show: (1) the specific amount of alleged price discrimination in the sale of truck chassis; (2) the relationship of that amount to the final truck selling price after the body was added; (3) the final selling price of the successful body companies; or (4) the margins involved. Because the chassis is only one component of the final product, and because the cost of the final truck was almost certainly determined by several factors unrelated to chassis price, the evidence of record is insufficient to establish that any price difference in chassis sold to body companies, as compared to those sold to Capital Ford, caused actual injury to Capital Ford. *See Marty's Floor Covering Co. v. GAF Corp.*, 604 F.2d 266, 270 (4th Cir.1979), *cert. denied,* 444 U.S. 1017, 100 S.Ct. 670, 62 L.Ed.2d 647 (1980); *Minneapolis–Honeywell Regulator Co. v. FTC*, 191 F.2d 786, 792 (7th Cir.1951), *cert. dismissed,* 344 U.S. 206, 73 S.Ct. 245, 97 L.Ed. 245 (1952). Accordingly, because Plaintiffs are unable to establish actual injury, Defendant's motion for summary judgment as to Plaintiffs' claims of price discrimination in connection with sales to body companies is GRANTED.

### 2. *Sales to Ryder Truck Rental, Inc.*

 Plaintiffs' claim with regard to sales of Ford trucks to Ryder is similar to the above "body company" claim. Plaintiffs do not allege price discrimination between Capital Ford and other Ford dealers in connection with competing efforts to sell heavy trucks to Ryder. Instead, Plaintiffs claim that Ryder was able to purchase heavy trucks from Ford dealers at CPA assisted prices which were less than the prices available to Capital Ford. As a result, Plaintiffs maintain that Ryder had an advantage over Capital Ford in subsequent transactions where Ryder, through a proposed lease, and Capital Ford, through a proposed sale, were competing for the same end-user customers. Plaintiffs have identified six customers allegedly lost to Ryder. Anderson Depo., pp. 529–33, 552–53. Defendant has moved for summary judgment as to this claim on several grounds. Because the court finds the first of these grounds sufficient to grant Defen-

dant summary judgment, it does not reach Ford Motor's remaining contentions.

As with the body company claims, Ford Motor argues that Plaintiffs have not met their burden of showing actual injury in connection with the sales to Ryder because they have not shown that any the sales which Capital Ford lost to Ryder were lost due to price discrimination. *See J. Truett Payne Co.*, cited *supra; Perkins,* 395 U.S. at 648, 89 S.Ct. at 1874. Defendant argues that the lost sales were the result of a number of factors unrelated to price discrimination, most importantly the fact that Ryder was engaged in leasing transactions while Capital Ford offered trucks for sale, and that Plaintiffs have failed to adduce sufficient evidence to show a causal connection between the price discrimination and lost sales. *See J. Truett Payne Co.*, 451 U.S. at 563, 101 S.Ct. at 1927.

To refute this claim, Plaintiffs rely on the deposition testimony of Mr. Anderson that former Capital Ford truck purchasers subsequently leased trucks from Ryder. Anderson Depo., pp. 521–24. Anderson confesses, however, that he has no specific information linking alleged price discrimination favoring Ryder with any customer loss by Capital Ford. *Id.* at 524, 528–34. He also admits that there are significant factors which differentiate the lease transactions offered by Ryder from the purchase transactions offered by Capital Ford, and that these factors may influence customer decisions to lease or buy. *Id.* at 528–29, 534. Even assuming, as Plaintiffs argue, that Ryder received across-the-board discounts which were not available to Capital Ford, Plaintiffs have failed to adduce any evidence that the sales allegedly lost to Ryder were the result of cost advantages enjoyed by another Ford dealer. *See J. Truett Payne Co.*, 451 U.S. at 563, 101 S.Ct. at 1927. As such, Defendant is entitled to summary judgment on the Robinson–Patman claims as they relate to sales to Ryder.

### 3. *Cargo CF–8000 Transactions.*

For the 1986 model year, Ford Motor introduced a new line of trucks identified as the Cargo model. Ford initially offered various sales incentives on these trucks, but the vehicle was not eligible for CPA until 1988.

Anderson Depo., pp. 623, 627, 639–40. Capital Ford purchased 12 Cargo CF–8000 trucks when the line was introduced. Capital Ford eventually purchased in excess of 25 vehicles, including 14 it purchased in late 1987 and 1988. *Id.* at 623–25, 639–42.

█ In August, 1988, Ford announced the availability of certain special discount incentives for various trucks which were in inventory at Ford's Kentucky Truck Plant. Included among these were 11 Cargo CF–8000 trucks from the 1987 model year. Merrifield Depo., Exs. 183, 184. The price incentives offered on the Cargo CF–8000s located at Ford Motor's Kentucky plant exceeded $6,000. The special discount incentives were not, however, applied on a retroactive basis to any Cargo CF–8000s which were in dealer inventory when the incentives were announced, Anderson Depo., pp. 651–54, and Ford Motor granted only $3,600 in CPA to Capital Ford in order to assist it in selling those CF–8000s it had in stock. Anderson Depo., pp. 639–42. Eventually Capital Ford sold its stock of CF–8000s at a loss. *Id.* Capital Ford challenges, as a violation of the Robinson–Patman Act, Ford Motor's failure to apply the special discount incentives offered in connection with the CF–8000s in inventory in Ford's Kentucky plant to vehicles that were in dealer stock at the time the incentives were announced.

Ford Motor has moved for summary judgment on this claim, maintaining that the special incentives offered by it on the CF–8000s left in inventory at its Kentucky Truck plant do not constitute actionable price discrimination. Defendant makes two specific claims which it contends take the special incentives out of the scope of the Robinson–Patman Act. Defendant first claims that the price incentives offered on the CF–8000 trucks were functionally available to all Ford heavy truck dealers, including Capital Ford. In response to this first argument, Plaintiffs claim that the court has previously disposed of the "availability" issue and need not revisit it.

Plaintiffs' claim that this issue has previously been resolved is without merit. In its order of September 12, 1990, the court merely denied Defendant Ford Motor's motion to dismiss the Cargo CF–8000 claim under Fed. R.Civ.P. 12(b)(6). That denial rested on the fact that Ford Motor had failed to cite persuasive authority as support for its position. *See* order of September 12, 1990, 779 F.Supp. at 1352. Ford Motor has now remedied that problem.

As discussed above, in connection with Plaintiffs' "body company" claims, the Eleventh Circuit has held:

> Where a purchaser does not take advantage of a lower price or discount which is functionally available on an equal basis, it has been held that either no price discrimination has occurred, or the discrimination is not the proximate cause of the injury.

*Delong Equip Co. v. Washington Mills Abrasive Co.,* 887 F.2d 1499, 1517 (11th Cir.) (quoting *Shreve Equipment, Inc. v. Clay Equipment Corp.,* 650 F.2d 101, 105 (6th Cir.), *cert. denied,* 454 U.S. 897, 102 S.Ct. 397, 70 L.Ed.2d 213 (1981). As Defendant accurately points out in its brief, the record shows that Capital Ford was treated identically to all other Ford Motor dealers with respect to the special price incentives on the Cargo CF–8000 vehicles. Anderson Depo., pp. 645–46. Plaintiffs concede that the discounts on the CF–8000s in Ford's Kentucky plant were made available to Capital Ford on an equal basis with other Ford dealers and the price discounts were not applied on a retroactive basis to any Cargo CF–8000 trucks held in any dealer's inventory. Anderson Depo., pp. 651–54; Wiggins Aff., ¶ 5.

As stated above, Plaintiffs' claim that this issue has previously been resolved is without merit. Ford Motor has now persuaded the court that the discount prices on the CF–8000 trucks were functionally available to Capital Ford and that this entitles Defendant to summary judgment. Accordingly, Ford Motor's motion for summary judgment on the claims relating to model CF–8000 trucks is GRANTED.[22]

---

**22.** It is unnecessary to reach Defendant's second argument, relating to competitive injury, with respect to this claim.

#### 4. *Transactions Involving Other Ford Dealerships.*

Claims relating to transactions between Ford Motor and other Ford dealerships are the most significant of Plaintiffs' Robinson–Patman claims. Plaintiffs have identified approximately 116 transactions involving Ford heavy trucks in which they contend that Ford discriminated in CPA and GPC as between Capital Ford and another Ford dealership when both dealerships were bidding for the same customer. In the extensive briefing on this issue, the parties have divided the transactions into two categories. The first category, involving seven transactions and thirteen vehicles, involves sales by Capital Ford's leading competitor, Peach State Ford Truck Sales, Inc. ("Peach State"), to certain municipalities under a contract between Peach State and the State of Georgia. The second category, involving the remaining 109 transactions, relates to sales by Ford dealerships to various public and private entities. These two categories are discussed separately below.

##### (a) Sales to local governments.

█ In the latter part of 1988, the State of Georgia, through its purchasing division, solicited competitive bids from numerous heavy truck manufacturers and dealers, including Capital Ford and Peach State, for the sale of heavy truck equipment. In connection with the preparation of their respective bids, both Capital Ford and Peach State submitted GPC requests to Ford Motor for the vehicles covered by the bid invitation. Ford Motor offered equivalent GPC commitments to both dealers, Anderson Depo., pp. 45–46, and based on those GPC offers Capital Ford and Peach State then submitted bids to the State of Georgia. Antel Aff., ¶¶ 4, 5.

On March 30, 1989, the State of Georgia contract was awarded to Peach State. The contract covered orders placed by both the State of Georgia and local governments through April 30, 1989 or the end of the model year, whichever was later. During the term of the contract, Peach State purchased numerous heavy trucks from Ford Motor to fill both state and local government orders. In these purchases, Peach State qualified for and received the per unit GPC guaranteed by Ford Motor during the bidding process. Antel Aff., ¶ 6.

Plaintiffs raise a Robinson–Patman claim with regard to certain sales made by Peach State to local governments under the State of Georgia contract. Plaintiffs contend that Capital Ford competed with Peach State on several of these sales, but was unable to underbid Peach State because the GPC assistance available to Peach State under the 1989 contract for these transactions was greater than that available to Capital Ford. According to Plaintiffs, the fact that Peach State received GPC awards guaranteed at the time of the 1989 contract, while Capital Ford received only the rainbow schedule level of GPC when competing for the same sales, violated the Robinson–Patman Act. Defendant challenges this claim on two grounds. Because the court finds the first argument to be persuasive, it does not consider Defendant's second argument.

█ Defendant argues that the sales by Ford Motor to Peach State and to Capital Ford were not "reasonably contemporaneous" under the Robinson–Patman Act and thus are not comparable for purposes of a price discrimination claim. Under the Act, allegations of illegal price discrimination between contracts must be evaluated as of the date each contract is made. *See FTC v. Borden Co.,* 383 U.S. 637, 643, 86 S.Ct. 1092, 1097, 16 L.Ed.2d 153 (1966) (the Robinson–Patman Act "proscribes unequal treatment of different customers in comparable transactions. . . ."). *See also M.C. Mfg. Co. v. Texas Foundaries, Inc.,* 517 F.2d 1059, 1066 n. 13 (5th Cir.1975) ("[T]he legality of price discrimination between contracts to purchase that contemplate contemporaneous delivery must be evaluated as of the date the respective contracts were made.").

Contracts which contemplate contemporaneous delivery, but which are entered into at different times, are not "reasonably contemporaneous" for purposes of the Act and are not the proper subject of a price discrimination claim. *Id.* The rationale for this was explained by the Seventh Circuit in *A.A. Poultry Farms, Inc. v. Rose Acre Farms,*

*Inc.*, 881 F.2d 1396, 1407 (7th Cir.1989), *cert. denied*, 494 U.S. 1019, 110 S.Ct. 1326, 108 L.Ed.2d 501 (1990):

> [n]o one supposes that a seller must charge the same price on contracts signed at different times, or on long-term contracts and spot sales.... Whether [defendant] engaged in price discrimination depends on whether it charged the same price to customers at the same time.

881 F.2d at 1407 (citing M. Rowe, *Price Discrimination Under the Robinson–Patman Act* 50 (1962)). *See also Pacific Molasses Co.*, 65 F.T.C. 675 (1964), *rev'd on other grounds*, 70 F.T.C. 301, 306 (1966) (citing the legislative history of the Robinson–Patman Act for the proposition that the bill does not prohibit sales at different prices under long-term and spot contracts).

Defendant maintains that awards of GPC to Peach State in connection with sales to local governments were governed by the commitments made by Ford Motor when Peach State bid for the 1989 State of Georgia contract. According to Ford Motor, the terms of the local government transactions, including price and GPC allocations, were established at the time bids were sought on the Georgia contract, and Ford Motor was obligated to provide Peach State with the level of GPC guaranteed at that time. In contrast, no such commitment existed for latter sales by Capital Ford to local government customers, and the GPC level was not set for sales by Capital Ford to municipalities until Capital Ford made a specific price assistance request to Ford Motor. Defendant maintains that, under these circumstances, there can be no allegation of price discrimination. The court agrees.

By its terms, the 1989 contract between Peach State and the State of Georgia governed both sales to local governments and sales to the state. Antel Aff., ¶ 6; Labelle Depo., pp. 44–51, 54. Thus, the level of GPC Ford Motor was obligated to provide on trucks ordered by Peach State to fulfill the contract, including orders for sales to local governments, was determined at the time Peach State bid on the contract. Antel Aff., ¶ 6. No contemporaneous commitment was made to Capital Ford. The Robinson–Patman Act does not require Ford Motor to make the GPC discounts guaranteed to Peach State in 1989 available to Capital Ford or other dealers who subsequently bid on sales to a municipality. *A.A. Poultry Farms*, 881 F.2d at 1407.[23]

Plaintiffs offer only one argument in an attempt to counter Defendant's motion for summary judgment. Plaintiffs argue that because delivery and transfer of title did not take place until the time that Peach State actually sold to the municipality under the State of Georgia contract, the price discrimination did not occur until that time. As explained above, however, price discrimination is to be compared as of the time of the contract, not at the time of delivery. *See M.C. Mfg. Co.*, 517 F.2d at 1066 n. 13. Again, when Ford Motor granted GPC to Peach State in connection with the sales to local governments, it was acting under a preexisting agreement. No similar agreement existed with Capital Ford. As a result, the GPC requests by Capital Ford and Peach State were not "reasonably contemporaneous" and are not the proper subject for a Robinson–Patman claim. As no material issues of fact remain, Defendant is entitled to summary judgment on this claim.

#### (b) Other transactions.

Ford Motor has attacked most of the remaining 109 transactions of price discrimination as failing to satisfy one or more of the elements necessary to make out a claim under the Robinson–Patman Act. According to Defendant, the remaining claims, which do satisfy all of the elements of a Robinson–Patman claim, are so small in number as to be *de minimis* and thus not actionable. Ford Motor has placed each contested transaction into a category based on the jurisdic-

---

**23.** Of course, the analysis would be different if Capital Ford had not been provided the same initial opportunity to enter into the State contract. *See e.g. Bouldis v. U.S. Suzuki Motor Corp.*, 711 F.2d 1319, 1326 (6th Cir.1983). Here, it is uncontested that Ford Motor offered the same GPC assistance to Capital Ford as it did to Peach State in connection with the 1989 bid for the State of Georgia contract. As such, the original arrangement between Peach Sate and Ford Motor was nondiscriminatory.

tional element the transaction allegedly fails to satisfy. These categories are discussed separately.

### (i) Absence of two sales.

■ As discussed above, to establish a claim under § 2 of the Robinson–Patman Act, Plaintiffs must make a showing of at least two sales to two different competing purchasers. *M.C. Mfg. Co.*, 517 F.2d at 1065 (quoting *Jones v. Metzger Dairies, Inc.*, 334 F.2d 919, 924 (5th Cir.1964), *cert. denied*, 379 U.S. 965, 85 S.Ct. 659, 13 L.Ed.2d 559 (1965)). In 51 of the 116 price discrimination transactions, Defendant points to uncontradicted evidence that no sale was made by Ford to any Ford dealer.[24] According to Defendant, the fact that no sale was made to any Ford dealer in these transactions is fatal to Plaintiffs' price discrimination claim because of the two purchaser requirement.

In opposition to Defendant's argument, Plaintiffs argue that they fall into an exception to the two purchaser requirement first established in *American Can Co. v. Bruce's Juices*, 187 F.2d 919 (5th Cir.), *modified*, 190 F.2d 73 (5th Cir.), *cert. dismissed*, 342 U.S. 875, 72 S.Ct. 165, 96 L.Ed. 657 (1951). *Bruce's Juices* involved a plaintiff who brought a price discrimination claim against a defendant can manufacturer. The claim was based on the defendant's refusal to offer plaintiff a price on particular cans (3.12 Iscans) that it was offering to plaintiff's competitors. Despite the fact that plaintiff did not purchase the 3.12 Iscans at issue, but only bid on them, the court held that plaintiff could bring the Robinson–Patman. The court based its decision on the fact that plaintiff was purchasing other types of cans not discriminatorily priced and was selling a product that competed with products packaged in 3.12 Iscans. 187 F.2d at 924. As

summed up by the Fifth Circuit, the *Bruce's Juices* holding:

> create[d] a special exception to the two-purchaser requirement where competitors in the same market are engaged in competitive purchasing and selling at the time of the price discrimination and where the failure of the plaintiff to consummate a second purchase of the item discriminatorily priced is directly attributable to defendant's own discriminatory practice.

*M.C. Mfg. Co.*, 517 F.2d at 1067 n. 17.

*Bruce's Juices* is inapplicable here. The case provides a very narrow exception to the two purchaser requirement of Robinson–Patman by allowing a plaintiff who has not consummated the *second* purchase required under Robinson–Patman to bring a price discrimination claim under certain narrowly defined circumstances. *See Gillette Tire Jobbers, Inc. v. Appliance Indus., Inc.*, 596 F.Supp. 1277 (E.D.La.1984). There is no evidence that *Bruce's Juices* intended to completely eviscerate the general rule that the Robinson–Patman Act requires at least two sales. No case has ever held that a claim under Robinson–Patman is cognizable when no sale of any product occurred. As such, Defendant is entitled to summary judgment on Plaintiffs' claims relating to these 51 transactions.[25]

### (ii) Goods of like grade and quality.

■ Ford Motor challenges seven transactions alleged by Plaintiffs to involve price discrimination on the ground that the dealer competing with Capital Ford was bidding a different model year truck.[26] According to Defendant, as a matter of law, vehicles from two different model years cannot be considered commodities of like grade and quality. Therefore, any price discrimination between such vehicles is not actionable under the

---

**24.** The subject transactions are documented at the following tabbed appendices to the first affidavit of William Anderson: 1, 2, 4, 9, 10, 11, 12, 19, 26, 28, 35, 36, 40, 41, 44, 46, 47, 51–53, 57–59, 61–64, 66–68, 73, 76, 77, 80–82, 85, 87, 90, 92, 93, 96–99, 107–111, 116.

**25.** Defendant does not argue that it is entitled to summary judgment on those transactions involving one, but not two, sales of trucks by Ford

Motor. As such, the court does not reach the issue of whether these transactions fall within the *Bruce's Juices* exception to the two purchaser rule.

**26.** The subject transactions are documented at the following tabbed appendices to the first affidavit of William Anderson: 6, 34, 65, 103, 105, 113, and 114.

Robinson–Patman Act. Defendant cites *Valley Plymouth v. Studebaker–Packard Corp.*, 219 F.Supp. 608 (S.D.Cal.1963) as support for its position.

Plaintiffs argue that Ford Motor miscites *Valley Plymouth* in support of its claim and that the determination of whether vehicles are of like grade and quality is a question of fact reserved for the jury. The court agrees. A careful reading of *Valley Plymouth* reveals that the district court in that case merely resolved an issue of fact by finding that cars of different model years were not of like grade and quality.

> The court concludes that a normal change in car models, made in good faith, as in the instant case, would come within the exception of the [Robinson–Patman Act], and that it, therefore, follows that the sale by Studebaker to Ranchero on December 31, 1960, *in the circumstances here involved*, did not constitute a violation of the [Act].

219 F.Supp. at 613 (emphasis added). While evidence that Defendant was awarding different levels of price assistance on trucks of different model years would probably not be violative of the Robinson–Patman Act, as long as Defendant differentiated between model years on a consistent basis, the evidence of record in this case fails to show such a consistent differentiation. The mere fact that the seven subject transactions involved different model year trucks is insufficient, by itself, to entitle Defendant to summary judgment. Accordingly, Defendant's motion for summary judgment on transactions involving trucks from different model years is DENIED. For the same reason, Ford Motor's motion for summary judgment on transactions in which Capital Ford and competing dealers were bidding different model trucks or trucks with different option packages is DENIED.

### *(iii) Non-competitive sales or bids.*

Ford Motor also seeks summary judgment with regard to numerous transactions because the dealers involved were either bidding different vehicles or were bidding at different times.[27] According to Ford Motor, these transactions fail to satisfy a fundamental requirement that the respective purchasers be in actual competition with each other. In addition, Ford Motor seeks summary judgment on transactions in which all dealers competing for the sale were quoted equivalent levels of CPA on the ground that no price discrimination occurred.

■ Defendant is clearly correct that, absent a difference in price offered to two competing dealers, no Robinson–Patman claim exists. *FTC v. Anheuser–Busch, Inc.*, 363 U.S. 536, 549, 80 S.Ct. 1267, 1274, 4 L.Ed.2d 1385 (1960). Further, in the absence of actual competition between the dealers, there is no basis for establishing the necessary element of competitive injury arising out of alleged price discrimination. *See M.C. Mfg. Co.*, 517 F.2d at 496; *National Distillers and Chemical Corp. v. Brad's Machine Products, Inc.*, 666 F.2d 492, 496 (11th Cir.1982). Plaintiffs, however, dispute Defendant's factual allegations that Capital Ford received equivalent CPA/GPC quotes on the subject transactions or that Capital Ford's bids in the subject transactions were not in actual competition with other dealers. Plaintiffs assert that each of the challenged transactions involved bids within weeks of each other to the same customers on the same or similar trucks, and that on each of these bids, Capital Ford did not receive

---

27. The subject transactions are documented at the following tabbed appendices to the first affidavit of William Anderson: 7, 14, 21, 22, 24, 31, 38, 42, 43, 49, 55, 71, 72, 78, 79, 86, 94, 100, 101, and 115. Defendant also challenges the transaction documented at tab 23, but does not specify the reason that Capital Ford and Peach State were not in actual competition with each other. In its reply brief, Defendant challenges six transactions (documented at tabs 8, 54, 69, 88, 112, and 117) in which it maintains that Capital Ford was the successful bidder, and thus sustained no antitrust injury and challenges a transaction involving a 1989 bid by Capital Ford and two other Ford dealers to Carolina Freight Carriers Corporation. These two claims were not addressed in Ford Motor's original brief in support of summary judgment, but only in its reply brief. Plaintiffs have not had an adequate opportunity to respond. As such, the motions for summary judgment as to these transactions are not properly before the court and will not be considered here.

equivalent CPA/GPC quotes from Ford Motor.

A review of each of the transactions challenged by Ford Motor shows that material issues of fact have been resolved only with respect to three transactions—those involving sales to the City of Jesup (Tab 21 to the Anderson Affidavit), the City of Lavonia (Tab 22) and Owsley & Sons (Tab 100). With respect to each of these transactions, Plaintiffs concede that all dealers bidding on the sales received equivalent levels of GPC at the time the vehicles were bid to the customer. Anderson Aff., ¶¶ 76, 77 and 156. Accordingly, Defendant is entitled to summary judgment with respect to these transactions.

As to the remaining transactions, material issues of fact remain with regard to whether Capital Ford and the competing dealer received equivalent grants of CPA/GPC or were in actual competition with each other. With respect to the bid involving the City of Marietta (Tab 24) and the transactions involving Pike County (Tab 101), Bartow Paving (Tab 94), Atlanta Gas Light (Tab 7), Cobb EMC (Tab 31), Georgia Department of Corrections (Tab 42), Hendrix Hauling (Tab 49), Jackson Electric Membership (Tab 55), Seelbach & Company (Tab 71), and Walker Trucking (Tab 86), the evidence of record conflicts as to whether the Peach State and Capital Ford received equivalent grants of GPC.[28] While in the transactions involving the City of College Park (Tab 14), Fulton County (Tab 38), and Georgia Power (Tab 43), the evidence of record shows that all Ford dealers bidding on the business received equivalent CPA/GPC awards at the time the vehicles were bid to customers, an issue of fact remains with regard to whether the dealers competing with Capital Ford actually received greater price assistance than was promised to Capital Ford.

With respect to the transactions involving Southeast Atlantic Corporation (Tab 72), Sutherland Egg (Tab 79), and the City of Roanoke (Tab 115), the evidence conflicts as to whether Peach State and Newnan Motor Company were bidding the customers at issue at the same time that Capital Ford was bidding those customers and whether Capital Ford was entitled to equalized CPA allocations despite its failure to request an extension of the CPA commitment.

As is evident from the above discussion, the evidence shows that material issues of fact remain as to whether Capital Ford was in actual competition with competing dealers or received equivalent grants of CPA/GPC with respect to transactions which are documented at the following tabbed appendices to the first affidavit of William Anderson: 7, 14, 24, 31, 38, 42, 43, 49, 55, 71, 72, 78, 79, 86, 94, 101, and 115. *See Hartley & Parker, Inc. v. Florida Beverage Corp.*, 307 F.2d 916, 920–21 (5th Cir.1962). Accordingly, Defendant's motion for summary judgment with respect to these transactions is DENIED. Defendant's motion for summary judgment with respect to transactions documented at tabbed appendices 21, 22 and 100 to the first affidavit of William Anderson is GRANTED.[29]

---

**28.** Ford Motor argues that the bid involving the City of Marietta, documented at Tab 24, actually involved two transactions and that Peach State and Capital Ford were granted equivalent levels of GPC on both. Ford Motor, however, cites no evidence to support this claim. In contrast, Plaintiffs point to evidence, in the form of affidavit of William Anderson, that the GPC levels were different. Anderson Aff., ¶ 78. Similarly, with respect to the transactions involving Pike County (Tab 101), Bartow Paving (Tab 94), Atlanta Gas Light (Tab 7), Cobb EMC (Tab 31), Georgia Department of Corrections (Tab 42), Hendrix Hauling (Tab 49), Jackson Electric Membership (Tab 55), Seelbach & Company (Tab 71) and Walker Trucking (Tab 86) Ford Motor argues that Capital Ford received the same or greater levels of CPA on the subject trucks, but points to no evidence. Plaintiffs point to evidence that Capital Ford received a lower CPA allocation on

the transaction. Anderson Aff., ¶¶ 150, 157, 62, 85, 96, 103, 109, 125, and 140.

**29.** In addition to the above discussed transactions, Plaintiffs have asserted an additional price discrimination claim in their supplemental brief in opposition to summary judgment, based on the allegation that Midway Ford ("Midway"), a Ford heavy truck dealer in Kansas City, was quoted a greater CPA discount than Capital Ford with respect to a proposed sale of 400 vehicles to ABF Systems, Inc. in 1986. Defendant contends that Plaintiffs have offered no substantiated, admissible evidence to support their assertion that Capital Ford was offered CPA of $12,625 per unit while Midway was quoted $13,900. A review of Plaintiff Anderson's third affidavit (attached to Plaintiffs' supplemental brief in opposition to Defendant's motion for summary judgment) and exhibit "D" to that affidavit, which documents

## (iv) Functional Availability.

Ford Motor has moved for summary judgment on nine transactions involving alleged price discrimination on the grounds that Capital Ford failed to take advantage of an available opportunity to appeal the grant of CPA.[30] Ford Motor contends that five of the seven challenged transactions (involving Altec, Florida Rock Industries, Guzzler Manufacturer, Harley Davidson and Utility Supply) were sales to SSP customers which were fully appealable, and the remaining two transactions (involving Cryar Lamp Company and Hester Bros. Paving) were also appealable. According to Ford Motor, the difference in price assistance provided to the competing dealer in these transactions was the result of an appeal taken by the competing dealer. Had Capital Ford appealed, Ford Motor maintains that it would have been eligible to receive CPA equivalent to that received by a competing dealer. As such, Ford Motor contends that the amount of price assistance awarded to the competing dealer was equally and functionally available to Capital Ford, and there can be no finding of price discrimination. *See Bouldis v. U.S. Suzuki Motor Corp.*, 711 F.2d 1319 (6th Cir. 1983).

Plaintiffs oppose Ford Motor's motion on the ground that, as a matter of fact, the appeals were not available to Capital Ford on these transactions. The evidence is uncontroverted that appeals from an award of CPA were not available except when the transaction involved the sale of ten or more trucks or when the transaction involved a sale to an SSP customer. Plaintiffs' Ex. 268, p. 9432. According to Plaintiffs, none of the above transactions involved sales of ten or more trucks. Further, with regard to the sales to the SSP customers, Plaintiffs contest the claim that appeals were functionally available. Plaintiffs claim that the list of SSP customers was confidential and, as such, even when Capital Ford was selling to an SSP

customer it had no way to know about the availability of an appeal.

After a review of the record, the court cannot say that no issues of material fact remain with regard to the functional availability of appeals to Capital Ford on these seven transactions. As to the transactions involving Cryar Lamp Company and Hester Bros. Paving, the sales at issue did not involve ten or more vehicles and these companies were not one of Ford Motor's 2,200 SSP customers. As such, it appears that no appeal was available to Capital Ford for these two transactions. With regard to the sales to the remaining five companies, the issue of whether Capital Ford could, in fact, learn that these companies were on Ford Motor's SSP list, and could appeal the original CPA grant, is in dispute. While Ford Motor maintains that access to the SSP list was available by calling the district office, Capital Ford has created a genuine issue of fact by pointing to evidence that continuous contact with that office to learn whether each customer was on the SSP list was infeasible and that, therefore, Capital Ford had no way of learning that appeals were available on these transactions. *See* Third Anderson Aff. (attached to Plaintiffs' supplemental brief opposing summary judgment on the merits) ¶¶ 1–4. Under these circumstances, a grant of summary judgment to Ford Motor on these transactions is not warranted and is DENIED.

## (v) De minimis transactions

 With regard to the transactions which Ford Motor does not challenge on one of the above grounds, Defendant contends that Plaintiffs have failed to offer evidence that these transactions, when compared to the overall sales volume of Capital Ford over the years in question, resulted in anything more than a *de minimis* injury to competition. Under these circumstances, Defendant claims that it is entitled to summary judgment.

the transaction, indicates that Ford Motor did grant greater CPA to Midway than to Capital Ford for the subject transaction. Under these circumstances, the court cannot say that no issue of material fact remains with regard to this transaction.

**30.** The subject transactions are documented at the following tabbed appendices to the first affidavit of William Anderson: 3, 33, 37, 45, 48, 50, and 83.

Defendant's argument is unpersuasive. The *de minimis* injury doctrine applies only when a plaintiff has no direct evidence of lost sales and adduces proof of competitive injury through evidence of substantial price discrimination over time. *See Alan's of Atlanta, Inc. v. Minolta Corp.*, 903 F.2d 1414, 1228 n. 20 (11th Cir.1990). In those cases, courts will consider whether, given the increment of price advantage granted to the favored competitor, injury to competition could arise. *Id.* In this case, however, Plaintiffs have adduced direct evidence of lost sales due to the alleged price discrimination. Accordingly, the *de minimis* injury doctrine is inapplicable. Defendant's motion for summary judgment on this ground is DENIED.

### 5. *Rainbow Schedules.*

Apart from the 116 transactions discussed above, in which Plaintiffs allege Ford Motor engaged in individual acts of illegal price discrimination, Plaintiffs contend that Ford Motor's CPA rainbow schedules and appeal criteria, by their very nature, violated the Robinson–Patman Act by doling out CPA/GPC benefits in an inherently discriminatory manner. Specifically, Plaintiffs contend that the system conferred greater price assistance benefits upon truck dealers who sold to high-volume purchasers than to dealers, like Capital Ford, whose customers purchase smaller numbers of vehicles.

Defendant contends that this claim must fail based on the fact that in each particular transaction, all dealers were entitled to equivalent levels of CPA. The CPA award depended only on the type and number of trucks involved. Because the overall customer base of any individual dealer did not affect CPA level, and because all CPA discounts were functionally available to Capital Ford, Ford Motor contends there is no actionable price discrimination.

■ As both parties recognize, the Supreme Court has held that a pricing system which grants standard quantity discounts does not give rise to a price discrimination claim if the discounts are functionally available to all customers. *FTC v. Morton Salt Co.*, 334 U.S. 37, 42, 68 S.Ct. 822, 826, 92 L.Ed. 1196 (1948). The Sixth Circuit, in the frequently cited case of *Bouldis v. U.S. Su-*

*zuki Motor Corp.*, 711 F.2d 1319 (6th Cir. 1983), has explained:

> [t]he practice of conditioning price concessions and allowances upon the customer's purchase of a specific quantity of goods will not give rise to a Robinson–Patman violation if the concessions are available equally and functionally to all customers.... Further, a claim of price discrimination will not lie if the buyer failed to take advantage of a price concession which was realistically and functionally available.... The legislative history reveals that the aim of the Act is to prevent a large buyer from gaining discriminatory preferences over the small buyer because of the large buyer's greater purchasing power.

*Id.* at 1326 (citations omitted). *See also Edward J. Sweeney & Sons, Inc. v. Texaco, Inc.*, 637 F.2d 105, 120–21 (3rd Cir.1980) (price discounts must be truly available to all distributors regardless of size of order), *cert. denied*, 451 U.S. 911, 101 S.Ct. 1981, 68 L.Ed.2d 300 (1981); *Shreve Equipment, Inc. v. Clay Equipment Corp.*, 650 F.2d 101, 105 (6th Cir.) (a discount must be functionally available to all purchasers), *cert. denied*, 454 U.S. 897, 102 S.Ct. 397, 70 L.Ed.2d 213 (1981).

■ The parties agree that the CPA/GPC system conditioned price concessions on the number of trucks a dealer sold in a single transaction. The undisputed evidence shows that a Ford dealer was required to engage in a sale of ten trucks to a single purchaser (or sell to an SSP customer) before an appeal was available from the CPA schedule and the maximum level of price assistance was granted. Ford Motor avers in its motion for summary judgment that the maximum purchase quantity discounts under the rainbow schedules and appeal criteria, which were granted in a sale involving ten trucks or more, were realistically available to all dealers.

Plaintiffs respond by adducing evidence which indicates that, because Capital Ford was not selling to large quantity purchasers, it did not qualify for the maximum price assistance under the CPA/GPC program.

This appears, however, to be the result of a marketing decision by Capital Ford to concentrate on sales to smaller volume customers as opposed to large fleet purchasers. Plaintiffs do not allege that Defendant in any way restricted the customers to whom Capital Ford could sell, and Plaintiffs have adduced absolutely no evidence that the purchase quantity discounts offered under the CPA/GPC program were not realistically available to all dealers if they chose to bid larger volume buyers. *See Bouldis*, 711 F.2d at 1326; *Shreve Equipment*, 650 F.2d at 105.

As discussed above, it may well be that Ford Motor has utilized its price assistance scheme to commit individual acts of illegal price discrimination against Capital Ford. The court finds, however, that Plaintiffs have failed to come forward with any facts to show that the CPA/GPC rainbow schedules and appeal criteria, by their very nature, violated the Robinson–Patman Act by awarding CPA/GPC benefits in an inherently discriminatory manner. As such, Defendant's motion for summary judgment as to this claim is GRANTED.

### D. Fiduciary Duty Claims.

In Count IV of their amended complaint, Plaintiffs allege that Ford Motor, in the Sales and Service Agreement and through the administration of the CPA and GPC programs, took on fiduciary responsibilities to act in the best interests of Capital Ford. Plaintiffs further allege that Ford Motor breached those duties by running Capital Ford out of business. Ford Motor does not challenge this claim on the merits, but instead alleges that the claim fails as a matter of law because the relationship between Ford Motor and Capital Ford is that of manufacturer and dealer operating under a written dealership agreement. According to Ford Motor, such arrangements, as a matter of law, do not create fiduciary relationships.

■ Defendant cites a plethora of decisions from numerous jurisdictions which refuse to find a fiduciary relationship arising out of business contracts, including franchise agreements. *See O'Neal v. Burger Chef Systems, Inc.*, 860 F.2d 1341, 1349 n. 4 (6th Cir.1988); *Rajala v. Allied Corp.*, 919 F.2d 610, 623 (10th Cir.1990), *cert. denied,* — U.S. ——, 111 S.Ct. 1685, 114 L.Ed.2d 80 (1991); *Domed Stadium Hotel, Inc. v. Holiday Inns, Inc.*, 732 F.2d 480, 485 (5th Cir. 1984). Defendant is correct that, except in cases of franchise terminations or when a duty is created by the express terms of a contract, courts do not impose general fiduciary obligations upon franchisors. *Domed Stadium*, 732 F.2d at 485 (citations omitted). Plaintiffs' argument to the contrary is without merit.[31]

■ Nevertheless, Plaintiffs claim that there are unique factors in this case which make the relationship between Capital Ford and Ford Motor a fiduciary one. First, Plaintiffs claim that the preamble language in the Sales and Service Agreement, to the effect that the parties express "confidence" in each other's "integrity and ability," establishes a fiduciary relationship. As Defendant correctly argues, however, the fact that one party expressly places confidence in another party is not sufficient evidence of a fiduciary relationship. *Rajala*, 919 F.2d at 624.[32] The fact that Ford Motor was under an obligation to treat Capital Ford with good faith and fairness, by virtue of the Federal Dealer's Day In Court Act and the duty of good faith required in every contract, similarly does not

---

31. Plaintiff cites *Arnott v. American Oil Co.*, 609 F.2d 873, 881 (8th Cir.1979) for the proposition that a fiduciary duty is inherent in a franchise relationship. *Arnott* takes a distinctly minority position and numerous courts have refused to follow the case. *See Domed Stadium*, 732 F.2d at 4485. The Eighth Circuit itself, in later decisions, has declined to follow *Arnott. See Bain v. Champlin Petroleum Co.*, 692 F.2d 43, 47–48 (8th Cir.1982).

32. Plaintiffs cite to *Ewers v. Ford Motor Co.*, 843 F.2d 1331 (11th Cir.1988) does not support the proposition that this language creates a fiduciary duty between Ford Motor and Capital Ford. The *Ewers* court referenced the preamble language in the Franchise Agreement to find that a question of fact existed as to whether a Ford dealer justifiably relied on the manufacturer's representations. *Ewers* did not hold that any obligations of fiduciary duty arise out of that language. In fact, the court rejected the dealer's contention that it had a "confidential relationship" with the manufacturer. *Id.* at 1335.

give rise to a fiduciary duty. *See Newark Motor Inn Corp. v. Holiday Inns, Inc.*, 472 F.Supp. 1143, 1151–52 (D.N.J.1979).

Plaintiffs argue finally that Ford Motor's actions, in going beyond the arm's length relationship that normally exists between manufacturers and dealers and exercising *absolute control* over all aspects of Plaintiffs' business, gave rise to fiduciary responsibilities on the part of Defendant. Courts have recognized that when one party assumes and exercises virtually complete control over another party, a fiduciary duty can arise. *See In re N & D Properties, Inc.*, 799 F.2d 726, 732 (11th Cir.1986). However, a fiduciary duty in such circumstances will not be found unless the party asserting the relationship present clear and convincing evidence. *Rajala*, 919 F.2d at 623.

In this case, Plaintiffs have not adduced the clear and convincing evidence necessary to establish a fiduciary obligation on the part of Ford Motor. Plaintiffs rely primarily on the claim that Ford Motor gained control over the level of Capital Ford's profits through the alleged price discrimination discussed above. Standing alone, however, the fact that Capital Ford may have been injured by virtue of violations of the Robinson–Patman Act is not sufficient to establish that Defendant had acquired the complete control over Capital Ford necessary to impute a fiduciary obligation. *See In re N & D Properties, Inc.*, 799 F.2d at 732. Plaintiffs refer to no other evidence to support their contention that Ford Motor somehow exerted *absolute control* over Capital Ford's day-to-day operations and nothing about this case suggests that Defendant exercised the type of control over Plaintiffs which would be required to impute a fiduciary duty. *Id.* Under these circumstances, Ford Motor is entitled to summary judgment on Plaintiffs' com-

mon law fiduciary duty claims and its motion is GRANTED with respect to those claims.

### E. Sherman Act Claim.

The only remaining claim under count V of Plaintiffs' complaint is the claim that certain transactions involving the sale of Ford heavy trucks to Ryder Truck Rental, Inc. ("Ryder") constituted vertical price fixing in violation of the Sherman Act.[33] Defendant claims that the undisputed facts now demonstrate Plaintiffs' lack of standing to assert such a claim and establish the absence of any foundation for a vertical price fixing claim in connection with the sales of Ford trucks to Ryder.

The facts relating to Ryder sales are as follows. During all relevant times, sales of Ford heavy trucks to Ryder were accomplished primarily through a process known as "trade packages." Under this process, Ryder's purchase of new vehicles from Ford Motor dealers (as well as competing dealers) was conditioned upon a *quid pro quo* purchase by the dealer of used trucks from Ryder. Affidavit, ¶ 4.

The procedure used for sales to Ryder under the trade packages is straightforward and uncontested. Ryder organized its trade packages by geographic areas and notified heavy truck manufacturers, including Ford Motor, of the date of each trade package meeting. Ford Motor, in turn, notified its dealers of the trade packages.[34] In advance of each trade package meeting, Ryder would circulate a list of its used trucks offered for sale. Based on these circulars, Ford Motor's dealers would independently decide whether they would participate in the trade package. Johnson Aff., ¶ 5. If they decided to participate, the dealers would first seek CPA allowances from Ford Motor.[35] They would then present a proposal to Ryder and meet with Ryder personnel to negotiate the final trade package. Johnson Aff., ¶ 6.

---

**33.** By order dated September 12, 1990, 779 F.Supp. 1345, the court dismissed Plaintiffs' other Sherman Act claims. The court declined to dismiss the claim relating to Ryder, finding that Plaintiffs had stated a cognizable claim under *Greene v. General Foods Corp.*, 517 F.2d 635 (5th Cir.1975), *cert. denied*, 424 U.S. 942, 96 S.Ct. 1409, 47 L.Ed.2d 348.

**34.** Unlike other truck manufacturers, Ford Motor did not sell directly to Ryder in the trade packages. Instead, all sales were made through participating Ford Motor dealers. Johnson Aff., ¶ 3.

**35.** Available CPA was allocated by Ford Motor either as a reduction of new vehicle prices or as an allowance on used vehicle bids. Johnson Depo., pp. 23, 33–34.

The negotiations at these trade packages focused only on the price the dealers would pay to buy Ryder's used trucks. Johnson Aff., ¶ 4. This was because the price at which the dealers would sell to Ryder was preset and not subject to change. The price was apparently set based on fleet price lists published by Ford Motor. Johnson Aff., ¶ 7. According to Plaintiffs, the profit that could be earned on trade package sales was limited to 4% because the fleet price lists which Ford published were based on this level of dealer profit. Witcher Aff., ¶ 9; Turnauer Aff., ¶ 6. Plaintiffs maintain that if the dealer sold in excess of the fleet price list in a trade package, the extra profit earned would be negated by a CPA chargeback.[36] Anderson Depo., p. 508.

Capital Ford alleges that by directly setting the prices at which Ford Motor's dealers must sell to Ryder in trade packages, and by enforcing those prices through a system of CPA chargebacks, Ford Motor instituted a "resale price maintenance" scheme which violates Section 1 of the Sherman Act.[37] Ford Motor contests this claim, and argues that the essential elements of a *per se* illegal resale price maintenance program have not been shown. In addition, Ford Motor seeks summary judgment on this claim on the ground that Plaintiffs lack standing.

■ Since the Supreme Court's decision in *Dr. Miles Medical Co. v. John D. Park & Sons Co.,* 220 U.S. 373, 31 S.Ct. 376, 55 L.Ed. 502 (1911), vertical resale price maintenance has been *per se* illegal under § 1 of the Sherman Act. In *Dr. Miles,* the Court proscribed written contracts between a manufacturer and dealer which fixed retail prices. *Id.* at 407–08, 31 S.Ct. at 384. The rule of *per se* illegality originally announced in *Dr. Miles,* however, was somewhat limited by the court in a decision eight years later. In *United States v. Colgate & Co.,* 250 U.S. 300,

39 S.Ct. 465, 63 L.Ed. 992 (1919), the Court explained:

> In the absence of any purpose to create or maintain a monopoly, the [Sherman Act] does not restrict the long recognized right of trader or manufacturer engaged in an entirely private business, freely to exercise his own independent discretion as to parties with whom he will deal. And, of course, he may announce in advance the circumstances under which he will refuse to sell.

*Id.* at 307, 39 S.Ct. at 468.

Since *Colgate,* courts have struggled to determine the reach of that decision and the continuing vitality of *Dr. Miles. See Yentsch v. Texaco, Inc.* 630 F.2d 46, 51 (2nd Cir.1980). In more recent times, the Supreme Court has affirmed that resale price maintenance is *per se* illegal under the Sherman Act, but only if enforced by a contract, combination or a conspiracy. *Albrecht v. Herald Co.,* 390 U.S. 145, 149, 88 S.Ct. 869, 871, 19 L.Ed.2d 998 (1968); *United States v. Parke, Davis & Co.,* 362 U.S. 29, 43, 80 S.Ct. 503, 511, 4 L.Ed.2d 505 (1960). Under modern precedent, the required combination may be shown in one of two ways. *Yentsch,* 630 F.2d at 52. An adequate showing is made if a plaintiff presents proof of an express or implied agreement between a manufacturer and a dealer to set resale prices. *See Business Electronics Corp. v. Sharp Electronics Corp.,* 485 U.S. 717, 724–25, 108 S.Ct. 1515, 1519–20, 99 L.Ed.2d 808 (1988). In the alternative, a plaintiff may show that the manufacturer secures adherence to his prices by means beyond mere refusal to deal, *i.e.,* by "coercion". *Simpson v. Union Oil Co.,* 377 U.S. 13, 17, 84 S.Ct. 1051, 1054, 12 L.Ed.2d 98 (1964) (holding that "a supplier may not use coercion on its retail outlets to achieve resale price maintenance").

---

**36.** Ford Motor's dealers would also occasionally sell directly to Ryder outside the trade packages. In those cases, the dealers would negotiate independently with Ryder. Like the trade packages, these sales usually involved a used truck purchase requirement and CPA was available to the dealers. The evidence of record shows that the prices Ryder pays in these direct sales were also based on Ford Motor's fleet price lists and profits were similarly limited. Anderson Depo., p. 507.

**37.** Section 1 of the Sherman Act states:

> Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal.

15 U.S.C. § 1.

In the instant case, Plaintiffs have conceded that no express or implied agreement existed between Ford Motor and participating dealers which set the price at which trucks were marketed to Ryder in trade packages. Instead, Plaintiffs maintain that Ford Motor's utilization of the CPA chargebacks coerced Capital Ford to sell trucks to Ryder at prices that Ford Motor set directly and which afforded insufficient profit for Capital Ford to survive. Ford Motor counters that this type of "coercion" has been repeatedly rejected by courts as insufficient to constitute a *per se* violation of the Sherman Act. As such, Defendant maintains that it is entitled to judgment as a matter of law on the Sherman Act claims.

Plaintiffs rely primarily on *Greene v. General Foods Corp.*, 517 F.2d 635 (5th Cir.1975), *cert. denied*, 424 U.S. 942, 96 S.Ct. 1409, 47 L.Ed.2d 348 (1976) for the proposition that Ford Motor's actions in setting the trade package prices and enforcing them with CPA chargebacks constitutes a *per se* violation of the Sherman Act. *Greene* involved a manufacturer, General Foods, that negotiated directly with certain national accounts and set the prices at which distributors were required to sell coffee and other institutional foods to these accounts. *Id.* at 641. Mr. Greene was a local distributor for General Foods who dealt with both local customers, with whom he was free to set his own price, and national customers whose prices were preset. Throughout 1970, Mr. Greene complained to General Foods about the low profit margin on sales to national account customers, and in alleged response to those complaints, General Foods reduced his overall Growth Opportunity Allowances (identical to CPAs in this case) and eventually terminated the distributorship. *Id.* at 644–45. Following his termination, Mr. Greene filed suit, alleging that the practices of General Foods constituted illegal resale price maintenance. The Fifth Circuit agreed.

What has emerged from the record of this case is a vast system for controlling resale prices.... Through its MFSA [national accounts] system, General Foods has segregated buyers of institutional food above a certain threshold in terms of annual demand.... General Foods has determined

prices for these buyers on the basis of its national MFSA list minus [certain allowances].... It is clear that General Foods went far beyond the simple announcement of terms and refusal to deal with a noncomplying independent distributor that is still permissible under *Colgate*. The MFSA invoice formset ... was a device for policing the conduct of distributors, and there was other evidence of monitoring of Greene's pricing to his [local] customers.

There was sufficient evidence for the jury to conclude that the precipitate termination of the distributorship ... was to punish him for failure to comply with the MFSA regime.... The entire MFSA system is unabashedly calculated to affect the resale price and it is enforced by the coercive potential of summary termination....

*Id.* at 657–58.

Plaintiffs equate the MFSA system at issue in *Greene* with the trade package procedure at issue here. A review of *Greene*, however, reveals that the case is distinguishable on important grounds. Most significantly, the Fifth Circuit found that General Foods's national account program was "enforced by the coercive potential of summary termination and ... reduction in [overall price allowances]." *Id.* at 658. The Court further found evidence that attempts by Greene and other distributors to sell to all customers, including national account customers, at any price they choose "were blocked by General Foods." *Id.* at 656.

In contrast to *Greene*, Capital Ford has presented no evidence in this case that Ford Motor enforced the trade package prices set with Ryder through the coercive means discussed above. There is no evidence that Ford Motor threatened termination for failure to sell to Ryder at the announced prices, or even that Defendant threatened to withdraw overall CPA/GPC support. To the contrary, it is undisputed that Ford dealers where free to participate or not participate in trade packages as they wished. There is no evidence of record that Ford Motor threatened or took any adverse action against dealers for declining to participate in the program, *see* Johnson Aff., ¶ 3, and the dealers who chose not to participate were free to sell

trucks to Ryder outside the trade packages by negotiating directly with Ryder. In sum, the "coercion" upon which Plaintiffs rely to establish a vertical price fixing claim in this case is not equivalent to the coercion at issue in *Greene.*

The fact that Ford Motor did utilize CPA chargebacks in conjunction with Ryder trade packages is simply not enough, by itself, to establish coercion. In contrast to *Lehrman v. Gulf Oil Corp.,* 464 F.2d 26 (5th Cir.1972), cited by Plaintiffs in support of their claim, it is undisputed that Ford Motor dealers were free to abstain from the trade packages and to make sales to Ryder or to other customers at any price without any penalty, including any loss of future CPA. Unlike other situations involving the CPA/GPC program, Capital Ford does not contend that Ford Motor withdrew overall price support which was crucial to Plaintiffs' survival as a penalty for not adhering to specified prices in the trade packages. *See Lehrman,* 464 F.2d at 38.

In sum, Plaintiffs have presented no evidence that they were coerced to sell trucks to Ryder at prices that Ford Motor set directly. As such, they have presented no evidence which would make out a claim of *per se* price fixing. Because, under the rule of reason, Plaintiffs have failed to present any evidence of an adverse effect on competition in the relevant market, they cannot avoid summary judgment on their Sherman Act claim. Accordingly, Defendant's motion for summary judgment as to count V of Plaintiffs' complaint is GRANTED.[38]

## V. *Summary.*

Accordingly, Plaintiffs' motion for a continuance [# 92–1] is DENIED. Plaintiffs' mo-

tion to abstain [# 91–1] is GRANTED. Defendant's motion for summary judgment on the constitutionality of the Georgia Motor Vehicle Franchise Practices Act [# 66–1] is DISMISSED without prejudice to refile. Plaintiffs' motion to notify the Attorney General of the State of Georgia of an attack on the constitutionality of the Georgia Motor Vehicle Franchise Practices Act [# 79–1] is DISMISSED as unnecessary. The court hereby STAYS all further proceedings with regard to Counts two, six and seven of Plaintiffs' complaint pending resolution by the State Court of Fulton County, Georgia of the constitutionality of the Georgia Motor Vehicle Franchise Practices Act. Defendant's motion to exclude affidavits filed in opposition to Defendant's motion for summary judgment [87–1] is DENIED IN PART and DISMISSED IN PART. Plaintiffs' motion for leave to file a supplemental brief in opposition to Defendant's motions for summary judgment [# 99–1] is GRANTED. Defendant's motion for summary judgment on the merits of Plaintiffs' claims [# 67–1] is GRANTED IN PART and DENIED IN PART. Defendant's motion to file an out of time motion to compel [# 72–1] is DISMISSED as moot.

SO ORDERED.

---

**38.** In view of this ruling, it is unnecessary to reach Defendant's antitrust standing argument.